**POLINO and PINTO, P.C.**
**A Professional Corporation**
**Moorestown Times Square**
**720 East Main Street, Suite 1C**
**Moorestown, NJ 08057**
**(856) 727-1777**
**By:   Joseph M. Pinto, Esquire**
**         Attorney for Plaintiffs**

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

| | | |
|---|---|---|
| DAWN GUIDOTTI, on behalf of herself and all other class members similarly situated | : | |
| | : | Civil Action No. 1:11-cv-01219/JBS |
| Plaintiffs | : | |
| v. | : | DOCUMENT E-FILED |
| | : | |
| LEGAL HELPERS DEBT RESOLUTION, L.L.C. a/k/a or d/b/a THE LAW FIRM OF MACEY, ALEMAN, HYSLIP AND SEARNS; ECLIPSE SERVICING, INC. formerly known as Eclipse Financial, Inc.; GLOBAL CLIENT SOLUTIONS, L.L.C.; LEGAL SERVICES SUPPORT GROUP, L.L.C.; JG DEBT SOLUTIONS, L.L.C.; ROCKY MOUNTAIN BANK AND TRUST OF COLORADO SPRINGS, COLORADO; LYNCH FINANCIAL SOLUTIONS, INC. t/a FINANCIAL SOLUTIONS LEGAL CENTER or FINANCIAL SOLUTIONS CONSUMER CENTER or FINANCIAL SOLUTIONS PROCESSING CENTER; JEM GROUP, INC.; CENTURY MITIGATIONS, L.P.; LEGAL HELPERS, P.C. t/a THE LAW FIRM OF MACEY AND ALEMAN; RELIANT ACCOUNT MANAGEMENT, L.L.C.; THOMAS G. MACEY; JEFFREY J. ALEMAN; JASON E. SEARNS; JEFFREY HYSLIP; THOMAS M. NICELY; JOEL GAVALAS; AMBER N. DUNCAN; HARRY HEDAYA; DOUGLAS L. McCLURE; | : : : : : : : : : : : : : | **FIRST AMENDED CLASS ACTION COMPLAINT SEEKING MONETARY DAMAGES AND INJUNCTIVE RELIEF WITH SPOLIATION NOTICE** |

MICHAEL HENDRIX; STEPHEN CHAYA;      :
JOHN DOE(S) 1-1000, JIM DOE(S) 1-1000,
TOM DOE(S) 1-1000, the said names of      :
John Doe(s), Jim Doe(s) and Tom Doe(s)
being fictitious      :

                Defendants      :


Plaintiff, DAWN GUIDOTTI, residing at 4103 Greenwich Lane, Mount Laurel, New

Jersey 08054, on behalf of herself and others similarly situated, by way of Complaint against the

defendants, says:

### INTRODUCTION

The defendants have created and are engaged in a plan or scheme to defraud the residents

of the State of New Jersey and other states by performing unlawful debt adjustment activities and

engaging in the unauthorized practice of law in the State of New Jersey. The law firm of Legal

Helpers Debt Resolution, L.L.C. and its individual members, recruits, employs and partners with

both front-end lead generators and back-end service companies, financial institutions and other

attorneys in New Jersey and other states to provide debt adjustment services creating the

impression that these services are to be performed or provided by attorneys. In fact, these

services are not performed by, nor were they ever intended to be  performed by, attorneys.

This unlawful plan or scheme is in violation of the New Jersey Debt Adjustment and

Credit Counseling Act, N.J.S.A. 17:16G-1, et seq. since these services are performed by for-

profit entities or persons not permitted to operate such business in New Jersey under the Act.

Such debt adjustment activity further constitutes the unauthorized practice of law in the

State of New Jersey.

Both violations constitute crimes under New Jersey law and are in violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, et seq., the New Jersey Racketeer Influenced and Corrupt Organizations Act, N.J.S.A. 2C:41-1, et seq., and other State laws.

Plaintiffs seek recovery of monies paid to the defendants and injunctive relief enjoining and restraining the defendants from doing business in New Jersey or with New Jersey residents.

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction pursuant to 28 U.S.C. 1332(d), diversity of citizenship and amount in controversy applying to class actions, and supplemental jurisdiction pursuant to 28 U.S.C. 1367 for violation of various state law claims asserted in the Complaint. Venue is proper under 28 U.S.C. 1391(a)(2) and (3).

## PARTIES

1.      Plaintiff Dawn Guidotti (hereinafter "plaintiff" or "Guidotti") is a citizen of and resides in the State of New Jersey at 4103 Greenwich Lane, Mount Laurel, New Jersey 08054.

2.      Defendant Legal Helpers Debt Resolution, L.L.C. also known as or doing business as The Law Firm of Macey, Aleman, Hyslip and Searns (hereinafter "LHDR") is a for-profit limited liability company incorporated in the State of Nevada on April 29, 2009 and registered to do business in the State of New Jersey on June 8, 2010 listing its registered agent and office as Thomas Nicely, 17 Academy Street, Suite 615, Newark, New Jersey 07102.  Its main office is located at Sears Tower, 233 South Wacker Drive, Suite 5150, Chicago, Illinois 60606, with administrative offices at 5010 West Carmen Street, Tampa, Florida 33609.  It registered to do business in Florida as a foreign limited liability company on July 6, 2010.  It lists its only New Jersey location at 17 Academy Street, Suite 615, Newark, New Jersey 07102.

3

3.      Defendant Eclipse Servicing, Inc. formerly known as Eclipse Financial, Inc. (hereinafter "Eclipse") is a Florida domestic for-profit corporation established June 9, 2004 with its main business office located at 5010 West Carmen Street, Third Floor, Tampa, Florida 33609 and a western business office at 2081 Business Center Drive, Irvine, California 92612.  Eclipse is not registered to do business in New Jersey.  Defendant Harry Hedaya (hereinafter "Hedaya") is the President of Eclipse and defendant Amber N. Duncan (hereinafter "Duncan") is the Vice President of Eclipse.

4.      Defendant Global Client Solutions, L.L.C. (hereinafter "Global") is a domestic for-profit limited liability company incorporated in the State of Oklahoma on August 7, 2003. Its main business office is located at 4500 South 129th East Avenue, Suite 177, Tulsa, Oklahoma 74134 and is not registered to do business in the State of New Jersey. Defendant Michael Hendrix (hereinafter "Hendrix") is the President of Global.  Hereinafter, any references to Global shall include Hendrix.  Global is an agent and account holder of defendant Rocky Mountain Bank and Trust Company of Colorado Springs, Colorado (hereinafter "Rocky") which is an FDIC non-member bank with a principal office at 101 East Main Street, Florence, Colorado.  Defendant Douglas L. McClure (hereinafter "McClure") is the President of Rocky. Hereinafter, any references to Rocky shall include McClure.

5.      Defendant JG Debt Solutions, L.L.C. (hereinafter "JG") is a domestic for-profit limited liability company of the State of New Jersey formed on September 11, 2009 with its main office located at 10000 Lincoln Drive West, Suite 5, Marlton, New Jersey, 08053-3400. Defendant Joel Gavalas (hereinafter "Gavalas") is the president and managing member of JG.

6.      Defendant Legal Services Support Group, L.L.C. (hereinafter "LSSG") is a

4

Nevada corporation formed on September 14, 2010.  Its managing members are (1) defendant Century Mitigations, L.P. (hereinafter "Century"), a Pennsylvania for-profit corporation with its principal office at 1061 Main Street, Suite 6, Irwin, Pennsylvania 15624, whose General Partner is defendant Consumer Financial Alternatives, Inc., with offices at the same address; (2) defendant JEM Group, Inc. (hereinafter "JEM"), a Nevada for-profit corporation with its main office at 8363 West Sunset Road, Suite 100, Las Vegas, Nevada 89113; and (3) defendant Lynch Financial Solutions, Inc. t/a Financial Solutions Legal Center or Legal Solutions Consumer Center or Legal Solutions Processing Center (hereinafter "Lynch"), a Florida for-profit corporation with its main offices at 17451 Derian Avenue, Suite 200, Irvine, California 92614 and Florida offices at 4521 PGA Boulevard, Suite 150, West Palm Beach, Florida 33418. Hereinafter, any refernces to LSSG shall include Century, JEM and Lynch.

7.      Defendant Thomas G. Macey (hereinafter "Macey") is an attorney at law of the State of Illinois and a managing member of or partner of LHDR.

8.      Defendant Jeffrey J. Aleman (hereinafter "Aleman") is an attorney at law of the State of Illinois and a managing member of or partner of LHDR.

9.      Defendant Jason E. Searns (hereinafter "Searns") is an attorney at law of the State of Colorado and a managing member of or partner of LHDR and is its general counsel.  Searns' main office is located at 5340 South Quebec Street, Suite 306N, Greenwood Village, Colorado 80111 and 303 East 17th Avenue, Suite 1070, Denver, Colorado 80203.

10.      Defendant Jeffrey Hyslip (hereinafter "Hyslip") is an attorney at law of the State of Ohio and a managing member of or partner of LHDR with a main office at 40 West 4th Street, Suite 525, Dayton, Ohio 45402.

11.     Defendant Thomas M. Nicely (hereinafter "Nicely") is an attorney at law of the State of New Jersey and the Commonwealth of Pennsylvania, and is a managing member of or partner of LHDR with his main office at 111 South Independence Mall East, Suite 55, Philadelphia, Pennsylvania 19106.  He resides at 9 Plum Court, Cherry Hill, New Jersey and claims to have an office at 1117 Harvest Road, Cherry Hill, New Jersey 08002, which has no telephone.  Nicely is also the Managing Attorney for the law firm of Macey and Aleman, located at the Philadelphia address set forth above, which is a trade name for defendant Legal Helpers, P.C., an Illinois for-profit professional corporation of which Macey is President and is solely a bankruptcy law firm.  Legal Helpers, P.C. also claims to have an office at 17 Academy Street, Suite 610 and/or 615, Newark, New Jersey 07102, which is staffed by its Managing Partner Alana Carrion, an attorney at law of the State of New Jersey.

12.     Defendant Reliant Account Management, L.L.C. (hereinafter "RAM") is a California limited liability company filed and established on April 17, 2009 with its main buiness office at 23972 or 23792 Rockfield Boulevard, Number 290, Lake Forest, California 92630.  Defendant Stephen Chaya is the managing member of RAM.  Any reference to RAM shall include Chaya.

**FACTS**

13.     LHDR advertises and markets itself as a national and the nation's largest debt resolution law firm maintaining partners in offices in all 50 states.  It also claims the following:

A.     It does not practice law in the State of New Jersey under the name of LHDR and all of its services provided in New Jersey to New Jersey residents are through the partnership of Macey, Aleman, Hyslip and Searns, and any office located in New Jersey is an

6

office of Macey, Aleman, Hyslip and Searns.

B.      It is owned and operated by debt resolution attorneys in every state.

C.      It works in professional alliance with many of the nations top reputable debt negotiation companies to assist clients as advocates for their rights and has created a cutting edge debt negotiation program to provide consumers with debt resolution services similar to those provided by large corporate law firms for their business clients.

D.      When potential clients contact LHDR, its attorneys review the customer's current financial situation and tailor a debt resolution plan that is unique to their situation. LHDR immediately contacts customers' creditors to inform them to contact LHDR as the customers' law firm regarding all issues of the customers' debt.  Additionally, LHDR has attorneys on staff to protect customers from any harassing debt collectors.

E.      LHDR makes no promises and will not guarantee it can negotiate customers' debts to a certain percentage.  It is a group of experienced attorneys and trained legal advocates and adheres to the following minimum performance standards:   If LHDR does not reduce the customers' debt by at least 35 percent of what the customer owes, it will refund the customers' fees for settling that particular debt and still resolve the debt on the customers' behalf.

F.      LHDR uses its diverse legal background to look at every client file with unique eyes.  Instead of pushing a client into one direction, LHDR discusses all available debt resolution options and tailors a plan for the client.  With offices in all 50 states, LHDR has the tools, knowledge and experience to get its clients out of debt.

G.      LHDR, like a security blanket, will take control of its clients' debt

7

resolution issues, will contact the clients' unsecured creditors to advise them that they should only communicate with LHDR as the clients' attorney.  In the event that any creditor or collection agency violates federal laws in regard to their debt collection practices, LHDR is prepared to fully represent the client to protect his or her rights under the relevant collection laws.

        H.     LHDR will analyze which debt resolution alternative makes the most sense for the customer and will explain those options to them.  In many situations, LHDR will propose the option of debt negotiation or a financial workout plan that the customer can afford. It will review individual circumstances and, if it feels that the customer has made the wrong decision, its attorneys will contact the customer to discuss other options.

        I.     If a customer's circumstances change or a particular debt resolution plan does not meet the customer's needs, LHDR is prepared to discuss additional alternatives including the discharge of debts via bankruptcy.  The customer will never be without a viable alternative.

        J.     LHDR claims the only way to become a client is through a mutual agreement in a formal engagement letter with the firm and its co-counsel.

        14.     Eclipse advertises and markets itself as a customer-centric one-stop back office solution for debt settlement companies looking to out source their customer service and debt management and negotiation requirements.  Its offers debt settlement plans in 48 states, either directly via a network of attorneys in those states where non-attorney based debt settlement is prohibited and services customized plans in all 50 states.  This technology allows customers of its clients to receive benefits such as real time online account access, electronic

8

signature/documents, archiving and service from a highly trained staff of professional debt negotiators and customer service agents.  Its private label back office program includes fully staffed customer service, creditor management, payment processing and a debt negotiation department for the benefit of its clients.  It specifically provides:

      A.     A 50 state attorney model;

      B.     Fees to 15 percent of total debt;

      C.     Docu-sign sign-ups;

      D.     Custom intranet; and

      E.     Text or email status notifications.

15.     Eclipse offers the following debt resolution plans:

      A.     No up-front fee;

      B.     Attorney assisted;

      C.     Traditional;

      D.     Lender based;

      E.     Commercial; and

      F.     Customized.

It also offers comprehensive training to its clients.

16.    A.     Global markets and advertises itself as a service provider to debt settlement companies providing account management services for their customers.  It is one of the largest account management companies in the United States and has developed and implemented its account management services specifically for the purpose of debt resolution, utilizing among other things non-interest bearing special purpose accounts (hereinafter "SPA")

which it claims are insured by the FDIC.  SPA's are disbursement accounts where monies are deposited usually through direct deposit arrangements with customers of the debt settlement companies.  Monies are disbursed from the SPA's to pay the fees of the debt settlement companies and creditors. Eclipse claims not to be associated with independent debt settlement companies.  It has created some of today's most cutting edge debt settlement account management products and is recommended by over 500 highly regarded debt settlement companies.  These debt settlement companies receive benefits such as improved cash flow with separation of debts and company fees, improved retention rate, decrease in overall servicing costs, less time managing client account information, decrease client set-up time, web-based software interface and open integration with debt management software packages.  Disbursement of SPA's are made only with the approval of the clients of the debt settlement companies, but those companies have access to the account information.  Global and Rocky maintain and operate debt management accounts for hundreds of third party businesses that offer debt adjusting services, electronically withdraw funds from a debtors account or receive funds forwarded by other means from the debtor and deposit these funds in a Special Purchase Account in Rocky, administered and maintained by Global.  Fees and costs are deducted from a debtor's SPA which are paid to various parties involved in the debt adjusting plan, such as LHDR, Eclipse, JG, Global, Rocky and other front-end or back-end affiliates of these parties and their employees, agents or servants.

B.      RAM is engaged in the same activity as Global, serving debtors who were or are clients of LHDR and other debt adjustment entities.  It describes itself as an independent third party.  It receives proceeds and posts payments from debtors' bank accounts, holds

10

payments in a trust account and disburses them as authorized, and provides account ledgers on each transaction.  It deducts from the trust account its own fees as well as those paid to LHDR and other debt adjustment entities.  RAM is not authorized to do business in New Jersey.

17.    JG claims to provide a debt settlement program to avoid filing bankruptcy.  It describes the program for settling debts as follows:

> You will be asked to put aside and save a set amount of settlement funds on a monthly basis.  This amount will be determined in your initial analysis based on total amount of debt and will be in line with your income and expense budget.  Once you have accumulated enough settlement funds, we will make a reasonable offer to your creditors to settle the debt.  JG Debt Solutions will begin the negotiation process.  Each person's situation is different and the negotiation process will begin at different times depending on the amount of the debt.  Once a creditor has agreed to a settlement amount, we will present this offer to you.  If you approve the settlement, we will instruct the creditor to fax over the settlement offer in writing.  Then have a three way recorded conversation with you, the creditor and us to settle the account.  Debts can be settled in two different ways, one lump sum or a term settlement.  One lump sum is just that, one payment and the account is paid.  A term settlement is a settlement which is paid over an extended period of time until the account is paid.  JG Solutions then moves through each debt until all of your debts have been paid and you are debt free.

It describes the program as simple, effective and broken down into three steps.

> 1.    A free debt consultation to review the financial situation and gather the necessary information to put together a customized debt settlement plan.
>
> 2.    Work with the customer on a debt relief plan that is tailored especially for the customer.  Many different options and payment structures allow the customer to customize his plan.
>
> 3.    It will negotiate with creditors to reduce the customer's debt as low as possible.

18.    LSSG provides qualified prospects (1) to certain lawyers and law firms who

11

provide legal services to consumers who meet established criteria, (2) to financial coaching and

debt education firms and (3) to debt management companies.  It enters into agreements with

entities or persons who specialize in the marketing and generation of qualified leads of

consumers who are experiencing financial issues and may require legal services associated with

resolving pending unsecured debt issues, including debt reduction and possibly bankruptcy

services, debt management and/or financial counseling or coaching for the purpose of utilizing

these entities or persons' marketing abilities in order to generate qualified leads.

19.     LHDR has entered into a support services agreement with LSSG which requires

LSSG to solicit and enter into marketing agreements with persons or entities as described above

who are designated as representatives.  These representatives must conform to the terms and

conditions required by LHDR in the marketing and generating of qualified leads which are set

forth in the agreement between LSSG and the representatives.  LSSG pays the representatives a

fee based on the enrolled debt of a lead approved by LSSG and accepted for retention by LHDR,

for non-legal services provided to and paid by a lead which is known as service costs.

20.     LSSG is managed by Lynch which markets and advertises itself as a company

that provides consumer leads to various debt resolution providers and refers consumers to

attorneys nationwide that are committed to providing the highest level of financial relief

programs and consumer protection services and have established a highly effective debt

resolution process.  Lynch is a front end provider of leads in the debt resolution business.   Jem

Group, Inc. ("Jem") is a back end debt relief company implementing, managing and maintaining

debt relief programs marketed and purportedly performed by front end affiliate debt settlement

companies, affiliate lead generators and LHDR.  Century Mitigations, L.P. ("Century") lists its

general partner as Consumer Finance Alternatives, Inc. and operates similarly to Lynch.

21.     In September 2009 plaintiff called JG seeking help in reducing her debts to various creditors rather than filing bankruptcy and spoke with Gavalas who explained the debt reduction program and that her credit card debt could be cut in half and paid off within three years.  To determine if plaintiff qualified for the program, Gavalas stated he needed information on her income, debts and a social security number so a credit check could be performed.  The decision on whether she qualified would be made by Eclipse and a payment program would be prepared for her.  Gavalas promised to call plaintiff to advise if plaintiff qualified.

22.     Gavalas called plaintiff shortly thereafter and advised she had been accepted in the program and could either pay $358.00 per month for three years or $200.00 per month for five years.  Plaintiff chose the three year plan and was advised that Eclipse would be emailing her papers enrolling her into the program and arranging for direct withdrawal of payments from her checking account for the monthly fees.  Plaintiff was also told she was being represented by attorneys in this process known as LHDR and that if any creditors contacted her she was to advise them she was working with LHDR and any paperwork received from any creditors was to be forwarded to LHDR when it was received.  Gavalas then asked a series of questions to which plaintiff had to respond.  This part of the call was recorded.

23.     Plaintiff received documents by email from CustomerServiceAccounts@ plansvc.com which stated it was sent on behalf of Customer Service by the Doc-U-Sign online signing service and requested plaintiff review and sign the documents.  Plaintiff received the following:

(a)     a power of attorney appointing LHDR her attorney in fact and authorizing LHDR

13

and/or its designees (1) to act as plaintiff's limited financial advisor and to represent plaintiff in negotiating the modification, reduction, settlement and payment of any and all debts allegedly due and owing in her name; (2) to request and receive confidential credit and account information from creditors, credit bureaus, collection agencies, creditor attorneys and any other third parties who may be possession of such information and could be viewed by plaintiff personally; and (3) to release a copy of the power of attorney to plaintiff's creditors and agents. The power of attorney listed LHDR's main office as Sears Tower, 223 South Wacker Drive, Suite 5150, Chicago, Illinois 60606, with administrative offices at 5010 West Carmen Street, Tampa, Florida 33609, the same address as the offices of Eclipse.  An email address of cs@plansvc.com was provided.

(b)       a Special Purpose Account application, and account agreement establishing a Special Purpose Account with Rocky Mountain Bank and Trust of Colorado Springs, Colorado, for the purpose of accumulating funds to repay debts in connection with a debt management program sponsored by LHDR.  Plaintiff also authorized the bank's agent, Global, to initiate debit entries to plaintiff's checking account at TD Bank in the amount of $353.62 per month until further notice.  The application advised that Global was the customer service agent for all matters relating to the SPA    and questions relating to the program should be addressed to LHDR.  Eclipse was listed on the application under the Schedule of Fees and Charges as Eclipse Financial, Inc., 3302.

(c)       an electronic payment authorization permitting LHDR or its designees to process debit entries from plaintiff's checking account with a $25.00 NSF fee automatically deducted.

(d)       a "welcoming packet" consisting of (1) a pledge to the client by LHDR; (2)

frequently asked questions and answers; (3) important information from the Compliance

Department of LHDR advising, among other things, that LHDR has initiated the procedures

necessary to notify creditors that plaintiff is being represented by an attorney, to provide

creditors with the phone number of LHDR rather than attempt to negotiate if contacted by a

creditor and to send in call logs every two weeks of any telephone calls received from creditors;

(4)      notice from the Accounting Department regarding a separate account for settlement

funds; (5) a procedure to be utilized to respond to creditors and collectors phone calls; (6)

instructions on how to handle those calls; (7) information on violations of the Fair Debtor

Collection Practices Act; and (8) a blank call log sheet.

      (e)      a retainer agreement between LHDR and plaintiff for legal services relating to

advice, counseling, analysis and negotiation services regarding plaintiff's unsecured debt, and

related financial circumstances regarding credit cards and unsecured lines of credit.  The

agreement states it is between LHDR, any assigns or related entities that may be formed in the

future and not any individual, parties, members or employees of LHDR.  The agreement

provides in part (1) that the agreement does not take effect and LHDR has no obligation to

provide any services until the agreement is signed and the flat retainer agreement fee paid; (2)

LHDR will negotiate and attempt to enter into settlements with creditors of plaintiff in an effort

to modify and/or restructure plaintiff's current unsecured debt; (3) LHDR shall subcontract

certain tasks including negotiations with creditors and collectors and certain customer support

responsibilities to a third party and LHDR and other legally trained, licensed personnel will

supervise all negotiations and customer support insuring that these services comply with

established procedures (4) that LHDR will not represent plaintiff in any matters before a court or

arbitration; (5) in the event a creditor or collector sues plaintiff, LHDR is under no obligation to provide representation but LHDR will discuss specific debt related issues with the client and, if appropriate, offer additional legal service in regard to bankruptcy and other debt resolution services for client's consideration; (6) the client must forward all correspondence from creditors including collection letters, demands and complaints to LHDR.

24.     In consideration for the services to be rendered, the client agrees to pay LHDR an initial flat fee retainer of $500.00 for debt review analysis and structuring of a debt resolution plan and a monthly maintenance fee/cost for the debt resolution plan in the amount of $50.00 per month.  If LHDR is able to obtain a 65% or greater reduction of client's total scheduled debt, it shall receive a contingency fee based on five percent of the amount of debt reduction.

25.     The implementation, management and maintenance of the debt resolution plan by LHDR shall be performed under the direct supervision of LHDR by Eclipse at a cost of fifteen percent of the client's total scheduled debt (called the service fee which is to be automatically deducted by LHDR from the client's bank account), which are not considered legal services. LHDR has a non-exclusive reciprocal referral agreement with FSLC (probably a typographical error - should be Eclipse as the letters FSLC appear no where else in the agreement, nor is there an explanation of what those letters stand for, although they could refer to defendant Lynch's trade name, Financial Solutions Legal Center) to provide these services under LHDR's direct supervision.

26.     A payment and fee schedule is attached to the retainer agreement and incorporated therein requiring the plaintiff to pay $461.05 for the three months beginning September 30, 2009 and $353.62 per month beginning December 30, 2009 until August 30,

2012.  From the first three payments, a retainer fee of $166.67 and a service fee of $244.38 is
deducted each month.  A monthly maintenance fee of $50.00 is also deducted each month.  From
December 30, 2009 to November 30, 2010, a service fee of $183.28 per month is deducted with
any amount in excess of the fees being accumulated in the SPA.

27.     No where in the retainer agreement does it state when LHDR is to begin the
negotiation process or if the client must accumulate a certain amount of funds before
negotiations will commence.  A document in the welcoming package entitled "Frequently Asked
Questions" states that once LHDR has been retained, it will send letters to creditors notifying
them that it represents the plaintiff and LHDR will then begin the negotiations.  Any offers or
settlements will be communicated to the client for approval.

28.     Plaintiff returned the documents, digitally signed, by email to Eclipse on
September 29, 2009 and copies were returned to her dated October 15, 2009 mailed October 19,
2009.  These documents did not have plaintiff's signature on them.  The monthly payments were
deducted from her checking account.  Between September 30, 2009 to December 21, 2010, the
plaintiff paid LHDR a total of $5,626.97 which consisted of a retainer fee of $500.00, service
fees of $2,932.50 and maintenance fees of $750.00.  The last account activity statement received
from Global set forth a balance in the account after all fees of $1,090.47 as of November 30,
2010.  No money was paid to any creditors of the plaintiff.

29.     The plaintiff's creditors continued to contact her, both in writing and by phone.
Plaintiff forwarded the phone logs and all correspondence received to LHDR and Eclipse at the
Florida address as required by the agreement, including offers made by the creditors to settle.
However, plaintiff did not receive any communications from LHDR, Eclipse or Global

17

concerning any settlement offers or the various contacts by the creditors.

30.     On or about February 3, 2010, Global sent a "Welcome to Global Client Solutions, L.L.C." letter providing information on the plaintiff's SPA.  The letter stated that plaintiff was a client of Eclipse Financial, Inc. and any questions regarding the negotiation of debts and the status of the debt program should be directed to Eclipse.

31.     On or about January 19, 2010, an attorney for Target National Bank sent plaintiff a collection letter which plaintiff forwarded to LHDR.  Plaintiff received a letter in return on LHDR letterhead stating that the letter was not legal advice and that she should send an FDCPA validation letter, which was included with the cover letter, to Target's attorney by certified mail, which was received by Target's attorney on March 19, 2010.

32.     On March 15, 2010, Target sued the plaintiff for $7,017.17 plus interest and costs. The complaint was mailed by the court to plaintiff on March 17, 2010 and plaintiff, upon receipt, forwarded the summons and complaint to LHDR.  Target's attorney responded on April 22, 2010 by letter that the validation letter sent by the plaintiff was too late and suit had been filed. Plaintiff forwarded that letter to LHDR.

33.     Plaintiff heard nothing from Eclipse nor LHDR and Target's attorney filed a motion to enter judgment which was received by the plaintiff shortly after December 7, 2010 and forward it to LHDR.

34.     On December 10, 2010, Eclipse responded stating that plaintiff did not and has not paid for Eclipse or LHDR (referred to as "us") to answer the lawsuit, but rather to manage and settle debts.  However, Eclipse stated it had three teams working on plaintiff's behalf to get the matter resolved.  The motion to enter judgment is still pending.

35.     Plaintiff received dunning letters concerning her indebtedness to GE Money Bank/Walmart, one in October 2009 and two in March 2010, the last being from Walmart's attorney, all of which were forwarded to LHDR.  GE filed suit against the plaintiff on May 11, 2010.  The summons and complaint were received by plaintiff shortly after May 13, 2010 and plaintiff forwarded them to LHDR.  Plaintiff heard nothing from LHDR or Eclipse concerning this matter.  The judgment was entered against the plaintiff on June 25, 2010 in the amount of $4,298.79.  A goods and chattels execution was issued on August 12, 2010.

36.     Plaintiff forwarded all bills and correspondence received from Citibank, one of her creditors, to LHDR, including any offers to settle.  On November 26, 2010, TD Bank, holder of plaintiff's checking account, was served with a levy in the amount of $11,884.49 resulting from a judgment entered against the plaintiff in favor of Citibank on September 7, 2010 in the Superior Court of New Jersey, Special Civil Part, Burlington County.

37.     Plaintiff received notice from TD Bank that the items presented for payment against her checking account on November 30, 2010 were not honored due to an insufficient balance in the account.  Plaintiff, for the first time, discovered Citibank had levied on her account.  A series of phone calls, emails and text messages were placed to and exchanged with LHDR, Eclipse and JG by the plaintiff concerning this matter.  Plaintiff forwarded on December 7, 2010 by facsimile to Shane Marine at Eclipse information concerning the levy.  Neither LHDR, Eclipse nor JG intervened.  A motion for turnover of funds was filed by Citibank seeking release of the $6,056.00 levied.  The court, on January 21, 2011, ordered the sum of $5,056.54 released to Citibank after plaintiff exercised her $1,000 statutory exemption.

38.     Plaintiff had to make a payment to LHDR by cashier's check in December 2010

19

since her bank account had been frozen by the levy.

39.     Performance of debt adjustment and credit counseling services in New Jersey is regulated by the New Jersey Debt Adjustment and Credit Counseling Act, <u>N.J.S.A</u>. 17:16G-1, et seq. (hereinafter "the Act") and the regulations promulgated by the Commissioner of the Division of Banking and Insurance as authorized under <u>N.J.S.A</u>. 17:16G-4.

40.     Under New Jersey law, no person other than a non-profit social service agency or a non-profit credit counseling agency shall act as a debt adjuster, <u>N.J.S.A</u>. 17:16G-2(a),  and such agencies must first obtain a license to do so from the Department of Banking and Insurance, <u>N.J.S.A</u>. 17:16G-2(b).

41.     A debt adjuster under New Jersey law means a person who either (a) acts or offers to act for a consideration as an intermediary between the debtor and his creditors for the purpose of settling, compounding or otherwise altering the terms of payment of any debts of the debtor or (b) who to that end receives money or other property from the debtor or on behalf of the debtor for payment to or distribution among the creditors of the debtor.   <u>N.J.S.A</u>. 17:16G-1(c)(1).

42.     An attorney at law admitted to practice in the State of New Jersey who is not principally engaged as a debt adjuster shall not be deemed a debt adjuster under the Act and therefore not subject to licensure.

43.     The fees which a licensee may charge for debt adjustment services under the Act shall not exceed one percent of the gross monthly income of the person to whom the service is rendered, but in no case shall the fee exceed $15.00 per month, except as may be otherwise provided by rule or regulation promulgated by the Commissioner.  The Commissioner is authorized to set the maximum fee for credit counseling.  <u>N.J.S.A</u>.

20

17:16G-6.

44.     Under N.J.A.C. 3:25-1.2, the fee for debt adjustment may not exceed $25.00 per month or $60.00 per month for credit counseling services.

45.     Any debtor injured by violation of the Act may bring a civil action for recovery of damages.

46.     Under the Act, every licensee acting as a debt adjuster shall disburse to the appropriate creditors all funds received from a debtor less any fees permitted by N.J.S.A. 17:16G-6 within ten days of receipt of those funds, maintain a separate trust account in a qualified bank as defined under paragraph 12 of N.J.S.A. 17:9A-1 in the name of the debt adjuster for the benefit of the debtors, serviced by the debt adjuster, and maintain an appropriate ledger book for the trust account required, having at least one single page for each debtor with the appropriate entries of all deposits into and disbursements from each debtor's account, including copies of all records showing disbursements to creditors and receipts from debtors which legible records shall be maintained in accordance with generally accepted accounting principals for not less than six years following the close of each debtor's account.

47.     Under N.J.S.A. 2C:21-19(f) (and N.J.A.C. 3:25-3.1(d)), any person who shall act or offer to act as a debt adjuster without a license as required by the Act unless exempted from licensure pursuant to the Act shall be guilty of a crime of the fourth degree.

48.     The actions of and the services provided by LHDR, Eclipse, Global, JG, LSSG, RAM, Rocky and all of their individual servants, agents and employees are debt adjusters as defined by statute.

49.     LHDR, Eclipse, Global, JG, LSSG, RAM and Rocky are not licensed by the

Commissioner of the Department of Banking and Insurance to perform debt adjustment or any other services, nor are they qualified to do so as they are not non-profit social service agencies or consumer credit counseling agencies as defined under N.J.S.A. 17:16G-1.

50.    LHDR, Macey, Aleman, Hyslip and Searns are not attorneys at law of the State of New Jersey and were principally engaged as debt adjusters, thus, they are not exempt from the licensing requirement of the statute and also are engaged in the unauthorized practice of law in the State of New Jersey.

51.    Nicely, although admitted to the bar of the State of New Jersey and listed as a partner in both LHDR and Legal Helpers, performs no services for LHDR and neither Nicely nor LHDR maintain a bona fide office within the State of New Jersey.  While Nicely resides in the State of New Jersey and lists an office within the state, that office has no telephone number.  He maintains an office in Philadelphia, Pennsylvania under the name of a separate law firm, Macey and Aleman, also known as Legal Helpers.  Legal Helpers also maintains an office in Newark, New Jersey, at 17 Academy Street, Suite 610 and/or 615, listing as its managing attorney Alana Carrion, who provides no services to LHDR and is not a member of LHDR.  Legal Helpers provides no legal services other than representation of consumers in bankruptcy cases.  On its letterhead, subsequent to the filing of the original Complaint in this action, LHDR now lists Alana Carrion as its New Jersey counsel.

52.    The business of debt adjustment and provision of debt resolution services are considered the practice of law under the laws of the State of New Jersey.

53.    LHDR, Eclipse, Global, JG, LSSG, RAM, Rocky and their agents, servants and employees, by operating as a business providing debt adjustment and resolution services, are

22

engaged in the unauthorized practice of law.

54.     Under <u>N.J.S.A.</u> 2C:21-22(a), a person is guilty of a disorderly persons offense if the person knowingly engages in the unauthorized practice of law and under subsection (b) is guilty of a crime of the fourth degree if the person knowingly engages in the unauthorized practice of law and creates the false impression that the person is licensed to practice law or derives a benefit or in fact causes injury to another.

55.     LHDR, Macey, Aleman, Hyslip, Searns, Nicely, Eclipse, Global, JG, LSSG, RAM and Rocky have also engaged in a criminal conspiracy as defined by <u>N.J.S.A</u>. 2C:5-2 by formulating,  promoting and engaging in the crimes of unlawful debt adjustment and the unauthorized practice of law.

56.     LHDR, Macey, Aleman, Hyslip, Searns, Eclipse, Global, LSSG, RAM and Rocky created the basic plan and operating procedure to engage in the debt adjustment business within the State of New Jersey and the other 49 states.  LHDR, Macey, Aleman, Hyslip and Searns utilized their status as attorneys to gain a competitive advantage in the debt adjustment marketplace and deceive consumers.

57.     Consumers in New Jersey and other states were misled into believing they were being represented by attorneys and thus would receive the professional services expected from an attorney by the general public.

58.     In fact, LHDR, Macey, Aleman, Hyslip and Searns provided no legal services nor any legal advice to any New Jersey customers, nor did they ever intend to do so.

59.     Eclipse was to be the sole provider of the debt relief services and Global, RAM and Rocky were to act as a depository for debtor's funds.

60.    Eclipse, LHDR, Macey, Aleman, Hyslip, Searns, Eclipse, Global, LSSG, RAM and Rocky created a marketing and promotion program to attract debtors through all forms of advertising in the media and contracting with lead providers for the purpose of selling debt resolution services throughout New Jersey and the United States.

61.    JG, LSSG and other numerous front-end debt relief companies with whom LHDR, Eclipse, Global and Rocky associate hold themselves out as being in the business of performing debt relief services when in fact they are only lead generators and/or initial processors of information acting on behalf of LHDR, Eclipse, Global, RAM and Rocky.

62.    JG was a front-end for-profit debt relief company established for the purpose of acting as such for LHDR and Eclipse and entered into an agreement with them for consideration to operate on their behalf to produce and service leads such as the plaintiff.

63.    A representative of Eclipse came to New Jersey to train Galavas and other employees of JG providing slides, training manuals and instruction on how to deal with customers, how to obtain information from them and how to explain the debt adjustment reduction plan.

64.    Part of Eclipse's training materials consisted of a sample LHDR retainer agreement such as the one signed by the lead plaintiff with a signature of an LHDR representative (which appears to be Hyslip) embossed on the form, an SPA application and agreement from Rocky, an LHDR electronic payment authorization, sample payment schedule and fee table, an enrolled creditor list, an LHDR power of attorney, a welcoming packet with all documents which were provided to the plaintiff, an LHDR addendum for extension of the program, a sample letter to creditors with the name of Hyslip already embossed thereon with

24

directions to communicate to their administrative offices in Tampa, Florida, LHDR addendum for secured debt, the compliance call recording script, including information and questions to be asked of the customer once accepted into the plan, and even an authorization to be signed by a Commanding Officer of military personnel customers to participate in the plan.

65.     JG would receive phone calls in response to the advertising and marketing by LHDR, Eclipse, Global, Rocky and JG from inquiring debtors.  JG received calls not only from New Jersey residents such as the lead plaintiff, but from different parts of the country as the phone calls were transferred around the country on a round robin basis to other front-end entities such as JG.  JG paid for inclusion within this rotating phone service.

66.     A representative of JG would take the phone call and explain the program to the prospective client.  JG's representative would read from a script telling the customer they would be represented by an LHDR attorney who was experienced in the negotiation of debt adjusting and would contact the creditors on the customer's behalf to negotiate a reduction.

67.     The customers were asked for information on the type and amount of indebtedness, their employment and income, their social security number for purposes of obtaining a credit report, their checking account number, the bank routing number and an email address.  They were told this information would be submitted to "underwriting" for a determination of whether the customer qualified to participate in the plan.  Customers were advised that, if accepted, they would pay money every month to be accumulated in an account which would be used for the purposes of negotiating with creditors.  Customers debts would be compromised so that they would pay 55 cents on the dollar including fees.  The first three payments would be higher than the usual plan payment because the $500.00 retainer had to be

25

paid to LHDR.  Customers were not told that creditors might not accept any negotiation of the debt.

68.     The information obtained about the customer was forwarded to Eclipse to determine how much the customers would pay.  No one was accepted for a plan unless they had at least $10,000 in debt and access to email.  The information was inserted into a payment calculator which determined how much the customer would pay without any consideration of the customer's personal circumstances and without any contact with the creditors or LHDR.

69.     If accepted, Eclipse would contact the front-end agent, JG in this case, advise them of that fact and prepare papers necessary for the customer to execute.

70.     The customer was then called, as was the lead plaintiff, told of the acceptance and read the compliance call recording script, which part of the telephone call was recorded.  This was referred to as the "genie" call.  JG representatives were instructed to prepare the customer for this recording.  Customers were told that certain questions had to be asked of them to which they had to respond and that, although some of the questions and information which they would hear might seem frightening or alarming, they were merely to answer "yes" to the questions and the JG representative would call them back after the recording was finished.  The representative further explained that the information they would hear during the "genie" call rarely, if ever, happened and that the attorneys would not let it happen, taking care of the problems that might arise.  The customer was advised not to ask any questions during the "genie" call or the call would have to be repeated.  The recorded call was transmitted to Eclipse.  After the recording, the customer was told the documents would be forwarded by email for electronic signature, that LHDR would not call or send out any cease and desist letters to creditors until the documents

26

were signed and returned.  Once the documents were signed, the JG representative advised the

customer (1) not to call JG again, rather any future contacts were to be through LHDR and

Eclipse who were in the same office in Florida; (2) to avoid all contacts with creditors; (3) of the

contact information for LHDR and Eclipse; (4) not to negotiate with the creditors; (5) missing

three payments would disqualify the customer from the program; and (6) to advise Eclipse if any

payments needed to be changed.

71.     If any questions were asked by the customer, JG representatives were instructed

on how to answer them.

A.     If the customer asked if they should make their minimum payments, they

were told that if they did, it would interfere with the negotiation process and make it harder to

negotiate.

B.     If they asked when the negotiation would begin, they were told when they

had enough money to being negotiating with the smallest creditor first.

C.     If they had any questions on the documents before signing and sending,

they were to call the JG representative and he would explain or answer the questions.  The

training manual had the documents included therein and an explanation of what to tell the

customer.

D.     If they asked the location of LHDR, they were advised that it was in

Florida.

E.     The JG representative did not speak with anyone from LHDR.

72.     JG's representative received commissions based on what was sold, that is the size

of the estimated compromised debt to be paid as calculated by Eclipse.  Goals were also set for

27

the representatives to reach so much debt per month, usually in the $100,000 to $200,000 range.

73.     In order to combat abuses in the debt relief industry, the Federal Trade Commission has substantively amended the telemarketing sales rules as it applies to for-profit debt relief companies which has caused LHDR and Eclipse to alter their business model and devise and new operating procedure to circumvent the new rule requirements.

74.     In part, the rule prevents charging up front fees, does not exempt attorneys per se, applies to both outgoing and incoming telephone calls, makes it illegal for front-end and back-end affiliate companies to provide substantial assistance to another company if it is known that company is violating the rule or if one remains ignorant of their actions.  However, the FTC has stated that debt relief providers, including attorneys who meet face to face with customers before signing any agreements, are likely to fit within the exemption of the rule on face to face meeting. LHDR, Eclipse, Global, Rocky, RAM and LLSG have now developed a procedure that would require a face to face meeting with a representative at the time the contract would be signed and an agreement with lead generators and LSSG to develop leads and market the debt adjustment services.

**COUNT ONE**
**New Jersey RICO Law**

75.     Plaintiffs repeat the allegations of the first 74 paragraphs of their Complaint and incorporate the same by reference as if set forth at length herein.

76.     LHDR, Eclipse, Global, JG, LSSG, RAM, Rocky and Legal Helpers are debt adjusters as defined under N.J.S.A. 17:16G-1(c)(1).

77.     Defendants LHDR, Eclipse, Global, JG, LSSG, RAM, Rocky and Legal Helpers are enterprises either separately and/or in unison as defined under N.J.S.A. 2C:41-1(c).

28

78.     At all relevant times, LHDR, Eclipse, Global, JG, LSSG, RAM, Rocky and Legal Helpers were engaged in trade or commerce or in activities affecting trade or commerce in connection with the sale of debt adjustment services in the State of New Jersey to New Jersey residents and residents of other states.

79.     Macey, Aleman, Hyslip, Searns and Nicely are persons as defined by N.J.S.A. 2C:41-2(b).

80.     These persons were either employed by or associated with LHDR, Eclipse, Global, JG, Rocky, LSSG, RAM and Legal Helpers and conducted or participated directly or indirectly in the conduct of the affairs of these enterprises through a pattern of racketeering activity in violation of N.J.S.A. 2C:41-2(c) and received income derived directly or indirectly from a pattern of racketeering activity by engaging in crimes under Chapter 20 and Chapter 21 of Title 2C of the New Jersey Statutes.

81.     All the defendants have, among other things, engaged in a pattern of racketeering, including criminal conduct that has either the same or similar purposes, results, participants, victims, methods of commission or are otherwise inter-related by distinguishing characteristics and are not isolated incidents.

82.     The criminal conduct includes, but is not limited to, violation of the following New Jersey Statutes:

A.     Theft by deception, N.J.S.A. 2C:20-4;

B.     Deceptive business practices, N.J.S.A. 2C:21-7(h) by making false and misleading written statements for the purposes of obtaining property;

C.     Falsifying records or uttering any writing or record knowing that it

29

contains a false statement or information with purpose of deceive or injury anyone or to conceal any wrongdoing, N.J.S.A. 2C:21-4(a);

D.     Engaging in bank fraud, 18 U.S.C. 1344;

E.     Engaging in wire fraud, 18 U.S.C. 1343;

F.     Issuing false financial statements, N.J.S.A. 2C:21-4(b);

G.     Making false or misleading statements in any advertisement addressed to the public or to a substantial segment thereof for the purpose of promoting the purchase or sale of services, N.J.S.A. 2C:21-7e;

H.     Selling, offering or exposing for sale or delivery less than the represented quantity of services, N.J.S.A. 2C:21-7b;

I.     Applying or disposing of property that has been entrusted to one as a fiduciary in the manner one knows is unlawful and involves substantial risk of loss or detriment to the owner of the property or to a person for whose benefit the property was entrusted, whether or not the actor has derived a pecuniary benefit, N.J.S.A. 2C:21-15;

J.     Causing or inducing another by deception as to the contents of the instrument to execute the instrument effecting or purposely to effect or likely to effect the pecuniary interest of the person, N.J.S.A. 2C:21-16;

K.     Impersonating another or assuming a false identity to obtain a benefit for one's self or another or to injure or defraud another, N.J.S.A. 2C:21-17(a)(1), (2), (3), (4) and (5);

L.     Acting or offering to act as a debt adjuster without a license and without qualifying for any exemption from the license requirement, N.J.S.A. 2C:21-19(f);

30

M.   Knowingly engaging in the unauthorized practice of law, N.J.S.A. 2C:21-22(a);

N.   Knowingly engaging in the unauthorized practice of law and creating or reinforcing a false impression that the person is licensed to engage in the practice of law or derives a benefit therefrom or in fact causes injury to another, N.J.S.A. 2C:21-22(b)(1), (2) and (3);

O.   Transporting or possessing property known or which a reasonable person would believe to be derived from criminal activity, N.J.S.A. 2C:21-25(a), (b)(1), (2)(a), (b), (c) and (d);

P.   Conspiracy to commit the aforesaid crimes, N.J.S.A. 2C:5-2 and all its subparts;

Q.   Conspiring to violate any of the provisions of N.J.S.A. 2C:41-2(c);

R.   Engaging in fraud or swindles, 18 U.S.C. 1341; and

S.   Engaging in a conspiracy to fraud and swindle, 18 U.S.C. 1349.

83.   The acts undertaken by the defendants in furtherance of racketeering activity include, but are not limited to:

A.   Recruiting front-end and back-end affiliates to commit violation of the aforesaid crimes, which include lead generators, debt relief companies and service companies and their agents, servants and employees;

B.   Lending a name to others for the purpose of creating a false pretense that legal and debt adjustment services are being performed by an attorney solely incidental to that attorney's practice of law thereby ostensibly exempting the services from the licensing

31

requirement;

C.     Marketing and soliciting materials and preparing and providing documentation and making oral representations giving the false impression the person was being represented by an attorney or licensed debt adjuster;

D.     Unlawfully engaging in the solicitation of clients for a law firm;

E.     Unlawfully managing, counseling, selling, pro rating or liquidating of the indebtedness of a debtor and involving a designated third party's receipt of debtor's funds for the purpose of distributing said funds among creditors in payment of debt obligations;

F.     Conspiracy to carry out an unlawful business scheme described in this Complaint;

G.     Falsely promising to provide debt relief services and accepting money from debtors in reliance on those promises;

H.     Receiving or paying commissions, fees and other renumeration for unlawful services rendered by defendants to debtors;

I.     Advertising, marketing, promoting and providing contracts and other documentation which falsely create an illusion or impression that debt relief services are being or will be lawfully performed, constitute the practice of law or being performed incidental to the practice of law;

J.     Collecting illegal fees, charges and costs for performing illegal services and services not permitted by law;

K.     Accepting money from New Jersey residents or residents of other states doing business with the defendants within the State of New Jersey or with connection to the

State of New Jersey knowing that it is unlawful to do so;

        L.    Conspiracy with and amongst themselves and others to violate the

provisions of N.J.S.A. 2C:41-2(d); and

        M.    Receiving income or proceeds directly from the pattern of racketeering.

### COUNT TWO
### New Jersey Consumer Fraud Act

84.    Plaintiffs repeat the allegations of the first 83 paragraphs of their Complaint and incorporate the same by reference as if set forth at length herein.

85.    The defendants in the operation of this unlawful business scheme and plan have engaged in unconscionable commercial practices, fraudulent activity, false promises, misrepresentation and knowing admissions of fact as described above in violation of N.J.S.A. 56:8-2 which include but are not limited to those acts set forth above.

### COUNT THREE
### New Jersey Debt Adjustment and Credit Counseling Act

86.    Plaintiffs repeat the allegations of the first 85 paragraphs of their Complaint and incorporate the same by reference as if set forth at length herein.

87.    The acts of the defendants have damaged the plaintiffs who are entitled to recover their damages pursuant to N.J.S.A. 17:16G-8

### COUNT FOUR
### Civil Conspiracy

88.    Plaintiffs repeat the allegations of the first 87 paragraphs of their Complaint and incorporate the same by reference as if set forth at length herein.

89.    The defendants, acting in concert, committed the aforesaid unlawful acts or lawful acts by unlawful means for the purpose of injuring the plaintiffs.

33

90.     Defendants understood the objectives of the conspiracy, accepted and agreed, either explicitly or implicitly, to do their part to further those objectives.

91.     As a result thereof, the plaintiffs have suffered damages.

## COUNT FIVE
## Illegal Contract and Unjust Enrichment

92.     Plaintiffs repeat the allegations of the first 91 paragraphs of their Complaint and incorporate the same by reference as if set forth at length herein.

93.     The purported contracts between the plaintiffs and defendants were illegal under New Jersey law and are void *ab initio*.

94.     Defendants will be unjustly enriched if permitted to retain the monies paid to them by the plaintiffs or emanating from plaintiffs' payments to other defendants as a result of the illegal and void contract.

## COUNT SIX
## Fiduciary Duty

95.     Plaintiffs repeat the allegations of the first 94 paragraphs of their Complaint and incorporate the same by reference as if set forth at length herein.

96.     The defendants had a fiduciary duty to the plaintiffs in all their dealings with the plaintiffs.

97.     The defendants breached their fiduciary duty to the plaintiffs by engaging in the aforesaid illegal, unlawful and fraudulent acts.

98.     As a result thereof, plaintiffs have suffered damages.

## COUNT SEVEN
## Unconscionability

99.     Plaintiffs repeat the allegations of the first 98 paragraphs of their Complaint and

34

incorporate the same by reference as if set forth at length herein.

100.    Any purported contracts between plaintiffs and defendants are unconscionable, both procedurally and substantively, and are therefore unenforceable and void.

101.    As a result of the illegal, unlawful and unconscionable acts of the defendants, the plaintiffs have suffered damages.

**COUNT EIGHT**
**<u>Common Law Fraud</u>**

102.    Plaintiffs repeat the allegations of the first 101 paragraphs of their Complaint and incorporate the same by reference as if set forth at length herein.

103.    The defendants materially misrepresented the facts as aforesaid, knowing or believing the same to be false with the intention that the plaintiffs would rely upon those misrepresentations.

104.    The plaintiffs reasonably relied on those misrepresentations to their detriment and suffered damages.

WHEREFORE, the plaintiff on behalf of herself and all others similarly situated demands judgment:

A.    Finding that the acts and omissions of the defendants constitute multiple violations of Civil RICO, N.J.S.A. 2C:41-1, et seq.;

B.    Finding that the acts and omissions of the defendants constitute multiple instances of unlawful practices in violation of the Consumer Fraud Act, N.J.S.A. 56:8-1, et seq.;

C.    Permanently enjoining and restraining the named defendants, John Doe(s) 1-1000, Jim Doe(s) 1-1000 and Tom Doe(s) 1-1000, being defined as their owners, officers, directors, shareholders, founders, managers, agents, servants, employees, representatives,

independent contractors, co-conspirators and all other persons or entities directly or indirectly under their control or participating in the unlawful plan and scheme from engaging in, continuing to engage in or doing any of the acts or practices set forth in this Complaint;

D.      Freezing all assets of the defendants wherever located and preventing defendants from engaging in any act of disposition of those assets in accordance with N.J.S.A. 56:8-8;

E.      Disgorgement of all illegal fees, charges and costs and other funds not already paid to creditors of the victimized plaintiffs so as to restore to them any money acquired by the unlawful acts of the defendants;

F.      Trebling of the damages of any plaintiff as permitted by the Consumer Fraud Act and New Jersey Civil RICO Act;

G.      Requiring the defendants to pay all attorney's fees, costs and litigation expenses incurred by the plaintiffs;

H.      Requiring defendants to pay pre-judgment interest on all of plaintiff's damages;

I.      Such other relief as the Court deems equitable and just under the circumstances.


**COUNT NINE**
**Class Certification**

105.    Plaintiffs repeat the allegations of the first 104 paragraphs of their Complaint and incorporate the same by reference as if set forth at length herein.

106.    This class action is brought on behalf of a class composed of all persons who have

36

paid fees, costs or charges or other monies not permitted by or in excess of those permitted by the New Jersey Debt Adjustment and Credit Counseling Act from six years prior to the filing of the Complaint through and including the date of judgment in this action, who either:

A.     Are New Jersey residents who entered into an attorney retainer agreement with LHDR for debt adjustment services;

B.     Are residents of other states who entered into an attorney retainer agreement with LHDR for debt adjustment services which arose from contacts with or referrals from JG or John Doe(s) or Jim Doe(s) or Tom Doe(s), the said names of John Doe(s) and Jim Doe(s) and Tom Doe(s) being fictitious;

C.     Are residents of the State of New Jersey from whom Eclipse, Global, RAM or Rocky received money as a result of said residents entering into attorney retainer agreements or debt adjustment agreements for unlawful debt adjustment services with John Doe(s) or Jim Doe(s) or Tom Doe(s), the said names of John Doe(s) and Jim Doe(s) and  Tom Doe(s) being fictitious; and

D.     Are residents of other states from whom Eclipse, Global, RAM or Rocky received any money as a result of said persons entering into attorney retainer agreements or debt adjustment agreements for unlawful debt adjustment services with John Doe(s) or Jim Doe(s) or Tom Doe(s), the said names of John Doe(s) and Jim Doe(s) and Tom Doe(s) being fictitious, which arose from contacts with JG, John Doe(s) or Jim Doe(s) or Tom Doe(s), the said names of John Doe(s) and Jim Doe(s) and Tom Doe(s) being fictitious.

107.     John Doe(s), the said name of John Doe(s) being fictitious, are defined as all for-profit debt adjusters doing business in New Jersey whether from within or outside the physical

37

boundaries of the State of New Jersey.

108.   Jim Doe(s), the said name of Jim Doe(s) being fictitious, are defined as not-for-profit debt adjusters doing business in the State of New Jersey, whether from within or outside the physical boundaries of the State of New Jersey, who do not have a New Jersey debt adjusters license or who have charged fees and costs not permitted by or in excess of those permitted by the New Jersey Debt Adjustment and Credit Counseling Act.

109.   Members of the proposed classes are so numerous that their joinder is impracticable.

110.   There are questions of law and fact common to each class.

111.   The claims and defenses of the named plaintiff are typical of the claims and defenses of the proposed class.

112.   The named plaintiff is a member of the proposed class and will fairly and adequately protect the interests of the proposed classes.

113.   The defendants have acted and refused to act on grounds generally applicable to the classes, making final injunctive relief appropriate, respecting the classes as a whole and rendering certification appropriate under Rule 4:32-1(b)(2).

114.   Common questions of law and fact central to the claims of the classes predominate over individual questions rendering certification appropriate under Rule 4:32-1(b)(3).

115.   The class action device is a superior method of adjudicating the class members' claims as compared to other available methods for fairly and efficiently adjudicating this controversy.  Class members are financially distressed persons who have no meaningful recourse

against the defendants absent collective pursuit of their monetarily small claims.  The value of class members claims taken individually is such that the claims cannot as a practical matter be pursued on an individual basis.

WHEREFORE, plaintiffs demand certification of the class and sub-classes as set forth herein.

## COUNT TEN
### Other Damages to the Lead Plaintiff

116.    Plaintiffs repeat the allegations of the first 115 paragraphs of their Complaint and incorporate the same by reference as if set forth at length herein.

117.    Plaintiff Dawn Guidotti, besides being damaged by the payment of unlawful fees, charges and costs, sustained other damages in her own right through:

A.     Levy of her bank account;

B.     Accumulation of interest and penalty charges on the debts which were enrolled in the fraudulent plan;

C.     Emotional distress, pain and suffering;

D.     Attorney's fees, out of pocket costs, court costs and litigation expenses;

E.     Degradation of her credit score and rating;

F.     Failure to return all monies paid by the plaintiff; and

G.     Any other unlawful activities of the defendants.

118.    These damages were caused by these unlawful acts and by the professional negligence of the defendants and are in violation of the New Jersey Consumer Fraud Act, the New Jersey Civil RICO Act, the New Jersey Debt Adjustment and Credit Counseling Act and the other tortious conduct as plead and constitute a conversion of plaintiff's funds.

39

WHEREFORE, plaintiff Dawn Guidotti demands judgment for compensatory and punitive damages, treble damages as permitted by law, attorneys fees, costs, litigation expenses, pre-judgment interest and any other relief the Court deems equitable and just under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues in accordance with the Rules of this Court.

POLINO and PINTO, P.C.

By: /s/   Joseph M. Pinto

Joseph M. Pinto, Esquire

Date:   March 17, 2011                     Attorney for Plaintiffs

## SPOLIATION NOTICE

### TO ALL DEFENDANTS

You are hereby given notice not to destroy, conceal or alter any paper or electronic files and other data generated by and/or stored on your computers and storage media (e.g., hard disks, floppy disks, backup tapes, Zip cartridges, CDs, DVDs, etc.), or any other electronic data, such as voice mail. As you know, your failure to comply with this notice can result in severe sanctions being imposed by the Court for spoliation of evidence or potential evidence.

Through discovery we expect to obtain from you a number of documents and things, including files stored on your computers and your computer storage media.

As part of our initial discovery efforts, you will soon receive initial interrogatories and requests for documents and things, requests for admissions and other forms of discovery.

40

In order to avoid spoliation, you will need to provide the data requested on the original media, or on exact copies of that media (sometimes referred to as image, evidentiary, or mirror copies), and be able to prove that the copy matches the original in every respect. Do not reuse any media to provide this data.

Additionally, in order to avoid spoliation you may have to suspend certain normal computer maintenance procedures, including but not limited to such procedures as defragmenting hard drives, deleting internet cookies, deleting browser history and favorites, and running any "disk clean-up" processes.

Although we may bring a motion for an order preserving documents and things from destruction or alteration, your obligation to preserve documents and things for discovery in this case arises in law and equity independently from any order on such motion.

Electronic documents and the storage media on which they reside contain relevant, discoverable information beyond that which may be found in printed documents.  Therefore, even where a paper copy exists, we will seek all documents in their electronic form along with information about those documents contained on the media.  We also will seek paper printouts of only those documents that contain unique information after they were printed out (such as paper documents containing handwriting, signatures, marginalia, drawings, annotations, highlighting and redactions) along with any paper documents for which no corresponding electronic files exist.

Our discovery requests will ask for certain data on the hard disks, floppy disks and backup media used in your computers, some of which data are not readily available to an ordinary computer user, such as "deleted" files and "file fragments." As you may know, although

41

a user may "erase" or "delete" a file, all that is really erased is a reference to that file in a table on the hard disk; unless overwritten with new data, a "deleted" file can be as intact on the disk as any "active" file you would see in a directory listing.

Accordingly, electronic data and storage media that may be subject to our discovery requests and that you are obligated to maintain and not alter or destroy, include but are not limited to the following:

### Introduction: Description of Files and File Types Sought

All digital or analog electronic files, including "deleted" files and file fragments, stored in machine-readable format on magnetic, optical or other storage media, including the hard drives or floppy disks used by your computers and their backup media (e.g., other hard drives, backup tapes, floppies, Jaz or Zip cartridges, CD-ROMs, DVDs) or otherwise, whether such files have been reduced to paper printouts or not. More specifically, you are to preserve all e-mails, both sent and received, whether internally or externally; all word-processed files, including drafts and revisions; all spreadsheets, including drafts and revisions; all databases; all CAD (computer-aided design) files, including drafts and revisions; all presentation data or slide shows produced by presentation software (such as Microsoft PowerPoint); all graphs, charts and other data produced by project management software (such as Microsoft Project); all data generated by calendaring, task management and personal information management (PIM) software (such as Microsoft Outlook or Lotus Notes); all data created with the use of personal or portable data assistants (PDAs), such as Blackberry, PalmPilot, HP Jornada, Cassiopeia or any other Windows CE-based or Pocket PC device; all data created with the use of document management software; all data created with the use of

42

paper and electronic mail logging and routing software; all Internet and Web browser-generated history files, caches and "cookie" files generated at the workstation of each employee and/or agent in your employ and on any and all backup storage media; and any and all other files generated by users through the use of computers and/or telecommunications, including but not limited to voice mail.

Further, you are to preserve any log or logs of network use by employees or otherwise, whether kept in paper or electronic form, and to preserve all copies of your backup tapes and the software necessary to reconstruct the data on those tapes, so that there can be made a complete, bit-by-bit "mirror" evidentiary image copy of the storage media of each and every personal computer (and/or workstation) and network server in your control and custody, as well as image copies of all hard drives retained by you and no longer in service, but in use at any time from six (6) years before the date the Complaint was filed to the present.

You are also to preserve and not destroy all passwords, decryption procedures (including, if necessary, the software to decrypt the files); network access codes, manuals, tutorials, written instructions, decompression or reconstruction software, and any and all other information and things necessary to access, view and (if necessary) reconstruct the electronic data we will request through discovery.

1. **Business Records**:  All documents and information about documents containing backup and/or archive policy and/or procedure, document retention policy, names of backup and/or archive software, names and addresses of any offsite storage provider.

A. All e-mail and information about e-mail (including message contents, header information and logs of e-mail system usage) sent or received concerning the subject

43

matter of this Complaint;

        B.     All databases (including all records and fields and structural information in such databases), containing any reference to and/or information about or related to the subject matter of this Complaint;

        C.     All logs of activity (both in paper and electronic formats) on computer systems and networks that have or may have been used to process or store electronic data containing information about or related to the subject matter of this Complaint;

        D.     All word processing files, including prior drafts, "deleted" files and file fragments, containing information about or related to the subject matter of this Complaint;

        E.     With regard to electronic data created by application programs which process financial, accounting and billing information, **all** electronic data files, including prior drafts, "deleted" files and file fragments, containing information about or related to the subject matter of this Complaint;

        F.     All files, including prior drafts, "deleted" files and file fragments, containing information from electronic calendars and scheduling programs regarding or related to the subject matter of this Complaint;

        G.     All electronic data files, including prior drafts, "deleted" files and file fragments about or related to the subject matter of this Complaint.

     **2.**    **Online Data Storage on Mainframes and Minicomputers:** With regard to online storage and/or direct access storage devices attached to your mainframe computers and/or minicomputers: you are not to modify or delete any electronic data files, "deleted" files and file fragments existing at the time of service of the Summons and this Complaint upon you, which

44

meet the definitions set forth in this notice, unless a true and correct copy of each such electronic

data file has been made and steps have been taken to assure that such a copy will be preserved

and accessible for purposes of this litigation.

3. **Offline Data Storage, Backups and Archives, Floppy Diskettes, Tapes and**

**Other Removable Electronic Media:** With regard to all electronic media used for offline

storage, including magnetic tapes and cartridges and other media that at the time of service of the

Summons and this Complaint upon you containing any electronic data meeting the criteria listed

in paragraph 1 above: you are to stop any activity that may result in the loss of such electronic

data, including rotation, destruction, overwriting and/or erasure of such media in whole or in

part. This request is intended to cover all removable electronic media used for data storage in

connection with your computer systems, including magnetic tapes and cartridges, magneto-

optical disks, floppy diskettes and all other media, whether used with personal computers,

minicomputers or mainframes or other computers, and whether containing backup and/or archive

data sets and other electronic data, for all of your computer systems.

4. **Replacement of Data Storage Devices:** You are not to dispose of any electronic

data storage devices and/or media that may be replaced due to failure and/or upgrade and/or

other reasons that may contain electronic data meeting the criteria listed in

paragraph 1 above.

5. **Fixed Drives on Stand-Alone Personal Computers and Network**

**Workstations:** With regard to electronic data meeting the criteria listed in paragraph 1 above,

which existed on fixed drives attached to stand-alone microcomputers and/or network

workstations at the time of service of the Summons and this Complaint upon you:  you are not to

45

alter or erase such electronic data, and not to perform other procedures (such as data compression and disk de-fragmentation or optimization routines) that may impact such data, unless a true and correct copy has been made of such active files and of completely restored versions of such deleted electronic files and file fragments, copies have been made of all directory listings (including hidden files) for all directories and subdirectories containing such files, and arrangements have been made to preserve copies during the pendency of this litigation.

6.      **Programs and Utilities:** You are to preserve copies of all application programs and utilities which may be used to process electronic data covered by this notice.

7.      **Log of System Modifications:** You are to maintain an activity log to document modifications made to any electronic data processing system that may affect the system's capability to process any electronic data meeting the criteria listed in paragraph 1 above, regardless of whether such modifications were made by employees, contractors, vendors  and/or any other third parties.

8.      **Personal Computers Used by Your Employees and/or their Secretaries and Assistants:** The following steps should immediately be taken to safeguard all personal computers used by you, your employees and/or their secretaries and assistants.

A.      As to fixed drives attached to such computers: (i) a true and correct copy is to be made of all electronic data on such fixed drives relating to this matter, including all active files and completely restored versions of all deleted electronic files and file fragments; (ii) full directory listings (including hidden files) for all directories and  subdirectories (including hidden directories) on such fixed drives should be written; and (iii) such copies and listings are to be preserved until this matter reaches its final resolution.

         B.      All floppy diskettes, magnetic tapes and cartridges, and other media used in connection with such computers prior to the date of service of the Summons and this Complaint upon you containing any electronic data relating to this matter are to be collected and put into storage for the duration of this lawsuit.

         **9.**      **Evidence Created Subsequent to This Notice:** With regard to electronic data created subsequent to the date of service of the Summons and this Complaint upon you, relevant evidence is not to be destroyed and you are to take whatever steps are appropriate to avoid destruction of evidence.

         In order to assure that your obligation to preserve documents and things will be met, please forward a copy of this notice to all persons and entities with custodial responsibility for the items referred to in this notice.