IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| DAWN GUIDOTTI on behalf of herself and other class members similarly situated | : | HON. JEROME B. SIMANDLE |
| | : | Civil No. 11-1219 (JBS/KMW) |
| Plaintiff, | : | |
| v. | : | **OPINION** |
| LEGAL HELPERS DEBT RESOLUTION, L.L.C., et al., | : | |
| Defendants. | : | |

APPEARANCES:

Joseph Michael Pinto, Esq.
POLINO AND PINTO, P.C.
720 East Main Street, Suite 1C
Moorestown, NJ 08057
        Counsel for Plaintiff

Shaji M. Eapen, Esq.
MORGAN, MELHUISH & ABRUTYN, ESQS.
        and
Richard W. Epstein, Esq.
GREENSPOON MARDER, P.A.
100 W. Cypress Creek Road, Suite 700
Ft. Lauderdale, FL 33309
        Counsel for Defendants

**SIMANDLE**, District Judge:

**Table of Contents**

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . 2
II.  BACKGROUND . . . . . . . . . . . . . . . . . . . . . . 5
     A.   Parties . . . . . . . . . . . . . . . . . . . . . 5
          1.   Law Firm Defendants . . . . . . . . . . . . 6
          2.   Bank Defendants . . . . . . . . . . . . . . 8
          3.   Other Moving Defendants . . . . . . . . . . 9
          4.   Non-moving Defendants . . . . . . . . . . . 10
     B.   Facts . . . . . . . . . . . . . . . . . . . . . . 11

          C.   Procedural History . . . . . . . . . . . . . .  21
III. DISCUSSION . . . . . . . . . . . . . . . . . . . . .  21
          A.   Arbitration Motions.. . . . . . . . . . . . .  22
               1.   Arbitration Clause in ARA . . . . . . . .  23
               2.   Arbitration Clause in AADS  . . . . . . .  32
               3.   Motion to Stay . . . . . . . . . . . . .  41
          B.   Motions to Dismiss - Personal Jurisdiction . . . . .  43
               1.   Standard of Review . . . . . . . . . . .  43
               2.   Bank Defendants  . . . . . . . . . . . .  45
               3.   Remaining Defendants . . . . . . . . . .  49
          C.   Motions to Dismiss - Failure to State a Claim . . .  49
               1.   Standard of Review . . . . . . . . . . .  49
               2.   Bank Defendants Global and RMBT . . . . . . .  51
               3.   Remaining Defendant LHP . . . . . . . . .  55
          D.   Non-Moving Defendants . . . . . . . . . . . .  56
IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . .  56

## I.   INTRODUCTION

This case is a putative class action alleging a conspiracy
to commit unlicensed debt adjustment services in violation of the
New Jersey Debt Adjustment and Credit Counseling Act, N.J. Stat.
Ann. § 17:16G-1, et seq., the New Jersey RICO statute, N.J. Stat.
Ann. § 2C:41-1, et seq., the New Jersey Consumer Fraud Act, N.J.
Stat. Ann. § 56:8-2, et seq., and various other common law causes
of action.  Plaintiff names twenty two defendants and charges all
defendants collectively with eight different causes of action.

Essentially, Plaintiff alleges that she was deceived into
contracting with Defendants in the hopes that they would convince
her unsecured creditors to settle her consumer debts without
requiring that she declare bankruptcy.  Instead, Plaintiff
alleges that they participated in a conspiracy to fleece her (and
others similarly situated) of her remaining assets without

negotiating with her creditors or protecting her from her creditors when they sued to collect on their debts.

Presently before the Court are six motions filed by eighteen of the twenty two Defendants. Nine of the Defendants (the "Law Firm Defendants") have moved to compel arbitration and to dismiss for lack of personal jurisdiction and for failure to state a claim. [Docket Items 20 & 21.] Four of the Defendants (the "Bank Defendants") have similarly moved to compel arbitration and to dismiss. [Docket Items 26 & 27.] Finally, a group of five other Defendants have moved to stay the action pending the arbitration requested by the other Defendants, and to dismiss for lack of personal jurisdiction and for failure to state a claim. [Docket Items 23 & 24.] All three of the motions to dismiss [Docket Items 20, 23 & 26] include an as-applied constitutional challenge to the New Jersey Debt Adjustment and Credit Counseling Act ("NJDACCA").

Plaintiff responded to these motions with two combined briefs in opposition, one opposing the motions regarding arbitration and one opposing the motions to dismiss. [Docket Items 48 & 49.] The moving defendants filed their reply briefs for both the motions to dismiss [Docket Items 72, 74 & 75] and the motions regarding arbitration [Docket Items 73, 76 & 77], and subsequently filed a notice of supplemental authority regarding the arbitration issues [Docket Item 78]. Plaintiff was later

granted leave to file a sur-reply brief to the Bank Defendants'
reply brief [Docket Item 83], and the Bank Defendants were then
granted leave to file a sur-sur-reply brief [Docket Item 88].

Additionally, the four Defendants that did not participate
in the instant motions filed letters with the Court requesting
that they be permitted to join in the motions, with the leave of
the moving parties' counsel. [Docket Items 89 & 96.]  Plaintiff
has notified the Court of her opposition to permitting these
nonmoving Defendants to join in the motions, explaining that
these additional Defendants raise different issues than the
moving Defendants and, therefore, would require additional
opposition from Plaintiff which she has not filed. [Docket Item
90.]

The Court heard oral argument on these motions on November
21, 2011.  The motions require the Court to decide issues of
whether to enforce either of two different arbitration clauses.
Depending on how the Court decides those issues, the Court may
also have to then decide whether Plaintiff has proven that the
various out-of-state corporations and corporate officers named as
Defendants in this action have established the minimum contacts
with New Jersey necessary to exercise personal jurisdiction over
these Defendants.  Finally, for those Defendants that the Court
determines are subject to its personal jurisdiction, the Court
must determine whether Plaintiff's Amended Complaint has alleged

sufficient facts to state a claim under any of the eight asserted theories, and whether doing so, as applied to those remaining Defendants, would violate the United States Constitution, specifically its Contracts Clause (Art. I, Sec. 10, Cl. 1) and the Dormant Commerce Clause (Art I, Sec. 8, Cl. 3).

For the reasons stated below, the Court will grant the Law Firm Defendants' motion to compel arbitration (and consequently deny their motion to dismiss as moot); deny the Bank Defendants' motion to compel, and deny the remaining Defendants' motion to stay the action.  The Court will further grant in part and deny in part the Bank Defendants' motion to dismiss, and will grant in its entirety the Remaining Defendants' motion to dismiss.


## II.  BACKGROUND

### A.  The Parties

Because Plaintiff's Amended Complaint names so many parties, and the alleged connections between the parties are so intricate, the Court will begin with a description of the Defendants and how they relate to each other.  Because the moving Defendants have organized themselves into three groups, the Court will begin by identifying the Defendants that belong to each of those groups, as well as the four remaining Defendants that were not among the

moving parties.[1]

       1.   <u>The Law Firm Defendants</u>

      The first group of Defendants is the Law Firm Defendants.
The nine Defendants in this group connect to this action through
Plaintiff's contract for legal and debt negotiation services.
This group includes two organizational entities, Legal Helpers
Debt Resolution, LLC ("LHDR") and Eclipse Servicing, Inc.
("Eclipse").  Additionally, Plaintiff named seven individual
lawyers and corporate officers affiliated with these
organizations.  Specifically, Plaintiff named as Defendants the
four managing members of LHDR: Thomas G. Macey, Jeffrey J.
Aleman, Jason E. Searns, and Jeffrey Hyslip.  None of these four
attorneys are alleged to be residents of New Jersey, and
Plaintiff alleges that they are not licensed to practice law in
New Jersey.  Am. Compl. ¶¶ 7-10.  Plaintiff also named Thomas M.
Nicely, who is a member of the New Jersey Bar, and alleges that
he is a "managing member of or partner of LHDR", a citizen of New
Jersey, and that he "claims to have an office" in Cherry Hill,
New Jersey, which Plaintiff alleges is not a "bona fide" office

---

    [1] As will become clear through the discussion of the parties
and causes of action, there is not complete diversity of
citizenship between the parties in this action.  However, because
subject matter jurisdiction in this action is based on the Class
Action Fairness Act, 28 U.S.C. § 1332(d), Plaintiff need not
establish complete diversity of citizenship, but only minimal
diversity.  <u>West Virginia ex rel. McGraw v. Comcast Corp.</u>, 705 F.
Supp. 2d 441, 448 (E.D. Pa. 2010).

for the practice of law in New Jersey.  Am. Compl. ¶¶ 11, 51.

Finally, also included in the Law Firm Defendants Group are two

corporate officers of Eclipse: Harry Hedaya (the President of

Eclipse) and Amber N. Duncan (the Vice President of Eclipse).

Am. Compl. ¶ 3.

Plaintiff alleges that LHDR is a national law firm,

incorporated in Nevada with its main office in Chicago, Illinois.

Am. Compl. ¶ 2.  Plaintiff alleges that LHDR markets itself as

"the nation's largest debt resolution law firm maintaining

partners in all 50 states."  Id. ¶ 13.  Also, Plaintiff alleges

that LHDR claims to "work[] in professional alliance with many of

the nations [sic] top reputable debt negotiation companies . . .

to provide consumers with debt resolution services similar to

those provided by large corporate law firms for their business

clients."  Id. ¶ 13(C).

Plaintiff alleges that Eclipse is one such debt negotiation

company with which LHDR works.  Plaintiff alleges that Eclipse

markets itself as a "back office solution for debt settlement

companies looking to outsource their customer service and debt

management and negotiation requirements."  Id. ¶ 14.  Plaintiff

alleges that LHDR contracted with Eclipse to provide customer

service, creditor negotiation services, provide online client

account access and electronic signature services.  Id.  In

Plaintiff's attorney retainer agreement ("ARA"), Plaintiff agreed

with LHDR that "LHDR shall subcontract certain tasks including negotiations with creditors and collectors and certain customer support responsibilities" to Eclipse, to be performed "under the direct supervision of LHDR."  Retainer Agreement ¶¶ V, VIII, Bratter Cert. Ex. C.

    2.  <u>Bank Defendants</u>

The second group of Defendants, of which there are four, connect to this action through Plaintiff's contract to open and operate a special bank account out of which she would pay LHDR and Eclipse's fees and in which she would save money that was intended ultimately to be paid to her settling creditors. Plaintiff names Rocky Mountain Bank & Trust ("RMBT" or "Rocky") as the financial institution where she opened this account and Global Client Solutions ("Global") as the "processing agent" that would operate the automatic fund transfers into this account and automatic payments out of it to LHDR and Eclipse.  Am. Compl. ¶ 4.  Plaintiff additionally names as Defendants the corporate officers of RMBT and Global, Douglas L. McClure, who Plaintiff alleges is the President of RMBT, and Michael Hendrix, who Plaintiff alleges is the President of Global.[2]  Plaintiff alleges

---

[2] Defendants Hendrix and McClure assert, in certifications attached to their motion to dismiss, that their titles are incorrectly alleged in the Complaint; Hendrix claims his correct title is Managing Member of Global and McClure claims his correct title is Director of RMBT.  Hendrix Cert; McClure Cert.  As these are facts outside the Amended Complaint, and as they are irrelevant to the pending motions, the Court will not consider

that

> Global and Rocky maintain and operate debt
> management accounts for hundreds of third
> party businesses that offer debt adjusting
> services, electronically withdraw funds from a
> debtors [sic] account or receive funds
> forwarded by other means from the debtor and
> deposit these funds in a Special Purchase
> [perhaps intended to be "Purpose"] Account in
> Rocky, administered and maintained by Global.

Id. ¶ 16(A).

### 3.   Other Moving Defendants

Finally, an additional five Defendants have filed a pair of motions to dismiss and to stay pending arbitration.  Unlike the previous two groups, the Defendants in this group are not contractually connected with Plaintiff, but are individuals or organizations that Plaintiff alleges are part of the larger nationwide conspiracy with the previous two groups of defendants to commit illegal debt adjustment services.

Defendant Legal Helpers P.C. ("LHP") is alleged to be a national bankruptcy law firm headquartered in Illinois, managed by Defendant Macey, that lists an office at the same address as the address listed for the office of Defendant LHDR in Newark, New Jersey.  Am. Compl. ¶ 11.

Defendant Legal Services Support Group, L.L.C. ("LSSG") is allegedly a Nevada Corporation that funnels customers seeking debt relief services, such as Plaintiff (though not,

---

these facts on this motion.

specifically, Plaintiff herself), to lawyers and law firms such as LHDR.  Id. ¶¶ 6, 19.  Defendants Century Mitigations, L.P. ("CMIT"), JEM Group ("JEM"), and Lynch Financial Solutions ("LYNCH") are alleged to be the managing members of LSSG.  Id. ¶ 6.  All four of these corporations are alleged to be headquartered and located in states other than New Jersey.  Id.

4.   Non-Moving Defendants

Finally, four Defendants were named in this action but did not join in the instant motions (though all four have, after the extensive briefing was completed, requested permission to join in the motions to dismiss of Groups 2 and 3, discussed above).  These Defendants include: JG Debt Solutions, L.L.C., Joel Gavalas, Reliant Account Management, L.L.C. and Stephen Chaya.  Defendant Gavalas is apparently an employee or officer of JG Debt Solutions, and was the employee with whom Plaintiff allegedly spoke when she initially sought out debt settlement assistance in 2009, who referred her to LHDR and Eclipse.  Am. Compl. ¶¶ 21-22.  Defendant Reliant Account Management is allegedly a California corporation that engages in similar business as Defendant Global, and Defendant Chaya is allegedly the managing member of Reliant.  Id. ¶¶ 12, 16(B).

**B.  Facts**[3]

In September of 2009, Plaintiff had amassed approximately $19,550 in unsecured consumer and credit card debt.  Am. Compl. ¶ 21; Attorney Retainer Agreement Schedule A, Bratter Cert. Ex. C.[4] Plaintiff called Defendant JG Debt Solutions, seeking help to reduce or negotiate a settlement of some of her debt rather than file for bankruptcy, and spoke with Defendant Joel Gavalas.  Am. Compl. ¶ 21.  Gavalas described a "debt reduction program" in which he suggested that Plaintiff's "credit card debt could be cut in half and paid off within three years."  Id.  Gavalas explained that Defendant Eclipse would evaluate her financial situation to determine whether she "qualified" for the program, and that if she did, a payment program would be prepared for her. Id.  Elsewhere in the Amended Complaint, Plaintiff alleges that it was the practice of Eclipse to only accept referred clients from JG (or similar lead generators) that had at least $10,000 in debt and access to e-mail.  Id. ¶ 68.

---

[3] Unless otherwise noted, the following facts are those alleged in the Amended Complaint or included in indisputedly authentic documents, the existence of which Plaintiff alleges in her Amended Complaint.

[4] Plaintiff alleges the existence of two contracts in this action: the Attorney Retainer Agreement she signed retaining LHDR, and the Special Purpose Account Application she signed to open an account with RMBT.  Am. Compl. ¶ 23.  Defendants attached undisputedly authentic copies of these agreements to the certification of counsel for Defendants Rebecca Bratter.  Where necessary, the Court will take note of facts and information contained in these attached documents.

Some time after this initial call, Gavalas called Plaintiff back and informed her that "she had been accepted in the program" and that Eclipse had proposed two alternate plans for participation in its program.  Id. ¶ 22.  Plaintiff was informed that she would be required to make monthly payments into a new bank account for a period of years out of which she would pay for the debt settlement negotiation services and also settle her debts with her creditors.  Id.  She was offered a three-year plan in which she would pay approximately $358 per month or a five-year plan in which she would pay approximately $200 per month.  Plaintiff chose the three-year plan.  Id.

In this conversation, Plaintiff was also informed that she would be represented in the debt negotiation process by attorneys from LHDR.  Gavalas then "asked a series of questions to which Plaintiff had to respond" which was recorded.  Id.  Elsewhere in the Amended Complaint, Plaintiff alleged it was the practice of JG and other similar organizations that fed clients to Defendants Eclipse and LHDR to "prepare the customer for this recording."  Id. ¶ 70.

> Customers were told that certain questions had to be asked of them to which they had to respond and that, although some of the questions and information which they would hear might seem frightening or alarming, they were merely to answer "yes" to the questions and the JG representative would call them back after the recording was finished.  The representative further explained that the information they would hear during [this] call

12

> rarely, if ever, happened and that the attorneys would not let it happen, taking care of the problems that might arise. The customer was advised not to ask any questions during the [] call or the call would have to be repeated. The recorded call was transmitted to Eclipse.

Id. However, Plaintiff does not specifically allege that this coaching and these reassurances were given to her, she merely alleges that "Gavalas then asked a series of questions to which plaintiff had to respond. This part of the call was recorded." Id. ¶ 22. Plaintiff does not allege what questions were asked of her, what her responses were, or what effect these questions had on her decision to contract for debt negotiation services with the Defendants.

Later that same month, Plaintiff received via e-mail a collection of documents regarding the debt settlement program. Included in these documents was an attorney retainer agreement (the "ARA") and an application to open a Special Purpose Account with RMBT (the "SPAA"). Id. ¶¶ 23(e), 23(b). Plaintiff signed both documents and returned them. Id. ¶ 28.

The ARA lays out the respective roles of LHDR and Eclipse in the debt settlement negotiation plan, states Plaintiff's fee arrangements to both of them, and limits the scope of the representation to be provided by LHDR. Bratter Cert. Ex. C. The Agreement describes LHDR as a "debt relief agency and law firm that provides debt resolution services to its clients." Id. ¶ I.

13

The ARA limits LHDR's services to only "negotiate and attempt to enter into settlements with creditors of the Client in an effort to modify and/or restructure Client's current unsecured debt." Id. ¶ III.  But the ARA expressly stated that LHDR would not provide services related to "Represent[ing] Client in any matter before a court, including foreclosure proceedings or in any arbitration or hearing" and that "In the event a creditor or collector sues Client, whether related to a debt obligation or any other claim, LHDR is under no obligation to provide representation."  Id.

The ARA further stated that LHDR would subcontract "negotiations with creditors and collectors" to "a third party" later identified in the ARA as Eclipse.  Id. ¶¶ V, VIII. However, the ARA states that "LHDR and other legally trained, licensed personnel will supervise all negotiations and customer support and ensure that these services comply with established procedures."  Id. ¶ V.

The fee structure established in the ARA provided that Plaintiff would pay LHDR an initial flat fee retainer of $500 and a contingency fee of 5% of the amount of debt reduction accomplished by the work of LHDR and its staff, which would include a credit of the initial retainer fee.  Id. ¶ VIII. Additionally, the ARA established that Plaintiff would pay a "service fee" to Eclipse of 15% of her total scheduled debt.  Id.

14

In Plaintiff's case, as her total scheduled debt was listed as $19,550, this fee amounted to $2,932.50 (though it was nowhere listed as a total figure in the ARA), to be paid in 15 monthly installments (the first 15 months of the 36 month program). Id. Schedule B.  In addition to these charges described in the text of the ARA, the attached Payment Schedule & Fee Table listed a monthly "maintenance fee" of $50, which, spread over the anticipated 36 months of the program, amounted to an anticipated $1,800.  Id.

The ARA also specified that Plaintiff agreed to establish an "authorized bank account" from which the Service Fees and legal fees would be automatically withdrawn on a monthly basis, with the first payment to start on September 30, 2009.  Id. ¶¶ VIII-IX.

The ARA included an enforceability clause, which states that "In the event that any portion of this Agreement is determined to be illegal or unenforceable, the determination will not affect the validity or enforceability of the remaining provisions of this Agreement, all of which shall remain in full force and effect." Id. XX.  Finally, and crucially to the instant motions to compel arbitration, the ARA also included an arbitration clause, which states

> **Arbitration:**
> In the event of any claim or dispute between Client and LHDR related to the Agreement or related to any performance of any services

related to this Agreement, such claim or
dispute shall be submitted to binding
arbitration upon the request of either party
upon the service of that request. The parties
shall initially agree on a single arbitrator
to resolve the dispute. The matter may be
arbitrated either by the Judicial Arbitration
Mediation Service or American Arbitration
Association, as mutually agreed upon by the
parties or selected by the party filing the
claim. The arbitration shall be conducted in
either the county in which Client resides, or
the closest metropolitan county. Any decision
of the arbitrator shall be final and may be
entered into any judgment in any court of
competence [sic] jurisdiction. The conduct of
the arbitration shall be subject to the then
current rules of the arbitration service. The
costs of arbitration, excluding legal fees,
will be split equally or be born by the losing
party, as determined by the arbitrator shall
decide [sic]. The parties shall bear their own
legal fees.

Id. ¶ XVIII.  Plaintiff signed the ARA on September 21, 2009.

As stated above, the collection of documents e-mailed to
Plaintiff also included the SPAA, which was an application for
the "authorized bank account" which Plaintiff agreed to open in
the ARA for the purpose of automatically deducting her service
fees and legal fees to LHDR and Eclipse, and out of which she
would eventually pay her creditors in the eventuality that they
agreed to a negotiated settlement.  The SPAA memorialized
Plaintiff's agreement to permit RMBT, "through it's [sic] agent
Global, to initiate debit entries" from her primary checking
account at TD Bank to the RMBT Special Purpose Account in the
amount of $348.68 per month, "for the purpose of accumulating

16

funds to repay my debts in connection with a debt management program sponsored by the organization identified below [LHDR, listed as "Macey, Aleman, Hyslip & Searns, LLC"]."  Bratter Cert. Ex. A.  The application also stated that Plaintiff agreed that Global was authorized to "periodically disburse[] funds from the Account pursuant to instructions that I may give from time to time. In this regard, I hereby authorize payment from the Account of the fees and charges provided for in this Application and the Agreement."  Id.

Additionally, the SPAA included an acknowledgment and agreement that "I understand that the Account's features, terms, conditions and rules are further described in an Account Agreement and Disclosure Statement that accompanies this Application (the "Agreement").  I acknowledge that I have received a copy of the Agreement; that I have read and understand it; that the Agreement is fully incorporated into this Application by reference; and that I am bound by all of its terms and conditions."  Id.  Plaintiff signed the SPAA on September 30, 2009.  Id.

The Account Agreement and Disclosure Statement ("AADS"), referred to above, includes, perhaps unsurprisingly, an arbitration clause.  "In the event of a dispute or claim relating in any way to this Agreement or our services, you agree that such dispute shall be resolved by binding arbitration in Tulsa

17

Oklahoma utilizing a qualified independent arbitrator of Global's choosing.  The Decision of an arbitrator will be final and subject to enforcement in a court of competent jurisdiction."

Id.

Plaintiff claims, in her brief in opposition to Defendants' motions to compel arbitration, that she had not received nor read the AADS (or, consequently, the arbitration clause) prior to signing the SPAA.  While the Amended Complaint is silent on the issue of when she first received the AADS, Plaintiff includes evidence in her Appendix attached to her opposition brief suggesting that at the time that she signed the SPAA in September of 2009, the documents she had received from LHDR, Eclipse, RMBT, and Global did not include the AADS, which did not arrive until after she received the executed ARA and SPAA in a mailing from LHDR postmarked on October 19, 2009.  Pl.'s Combined Appx. at 129-146.  There is, however, no evidence that, upon receiving the AADS less than three weeks after signing the SPAA, she made any effort to contest the terms or the arbitration clause.

Plaintiff's first payment to the SPA was made on September 30, 2009; Plaintiff allegedly deposited into the RMBT account, over the course of the following 15 months, a total of $5,626.97. Out of this account, the entire 15% service fee to Eclipse was paid, amounting to $2,932.50, the $500 retainer fee was paid to LHDR, and Plaintiff paid maintenance fees of $750.  Am. Compl. ¶

28.  Plaintiff alleges that after all these fees were deducted, she was left with a surplus of only $1,090.47 as of November 30, 2010.[5]  Id.

During those fifteen months that Plaintiff was paying her monthly payments to the RMBT account, she was not making any payments on her credit cards or other debts, apparently pursuant to her understanding of the LHDR/Eclipse debt settlement negotiation plan.  Id. ¶ 23(d); ¶ 71(A) ("If the customer asked if they should make their minimum payments, they were told that if they did, it would interfere with the negotiation process and make it harder to negotiate.").[6]  She received multiple calls from her creditors and settlement offers, all of which she forwarded to LHDR, expecting that they would address and negotiate a settlement on the accounts.  Am. Compl. ¶ 29.  However, none of her debts were settled by LHDR or Eclipse, and she observed no negotiation efforts undertaken by either.  Id. ("plaintiff did not receive any communications from LHDR, Eclipse or Global concerning any settlement offers or the various contacts by the creditors.")

Plaintiff notes in her Amended Complaint that the ARA does

_____

[5] The Court notes that these allegations leave approximately $340 unaccounted for from the total amount Plaintiff is alleged to have deposited into her SPA.

[6] The Court notes that there is no allegation in the Amended Complaint that Plaintiff herself was told this.

not explicitly state "when LHDR is to begin the negotiation process or if the client must accumulate a certain amount of funds before negotiations will commence." Id. ¶ 27. Though Plaintiff notes that she was sent a document from LHDR in a "welcoming package" in October of 2009, listing frequently asked questions, which stated that once it had been retained, LHDR would "send letters to creditors notifying them that it represents the plaintiff and LHDR will then begin the negotiations." Id. However, she alleges that if a customer were to have asked JG during the initial client contact, the customer would have been told that negotiations would not begin until the customer "had enough money [saved in the SPA, after fees] to begin negotiating with the smallest creditor first." Id. ¶ 71(B).

Throughout 2010, Plaintiff received increasingly dire communications from her creditors, eventually resulting in three of Plaintiff's four creditors suing her to recover the sums owed. Id. ¶¶ 31-37. When Plaintiff requested LHDR's assistance with a suit for recovery filed by Target National Bank, Eclipse responded by noting that the ARA did not cover defending Plaintiff from suits, "but rather to manage and settle debts." Id. ¶ 34. Plaintiff's final payment to the SPA was made by cashier's check in December of 2010 because one of her creditors levied the remaining funds in her TD Bank checking account. Id.

¶ 38.  The Amended Complaint does not specify how Plaintiff's relationship with Defendants was eventually terminated, or the final total amounts she has been obligated to pay her creditors in the form of judgments against her.

### C.  Procedural History

Plaintiff initially filed this action in the Superior Court of New Jersey, Burlington County, on January 28, 2011.  Defendant LHDR was served with the summons and Complaint on February 9, 2011.  LHDR removed the action to this Court on March 4, 2011. [Docket Item 1.]  Plaintiff thereafter filed the currently operative Amended Complaint on March 17, 2011.  [Docket Item 4.] Approximately two months later, the eighteen moving Defendants filed the instant motions, upon which briefing was concluded, and the Court heard oral argument on November 21, 2011.

### III.  DISCUSSION

As described briefly above, Defendants seek multiple, alternative forms of relief from the Court through their motions. Because the moving Defendants seek different forms of relief in self-organized groups, and each group of Defendants stands in slightly different posture with respect to the Plaintiff, the Court will address their pairs of motions in the following sequence: first, the Court will address the motions to compel arbitration and the motion to stay pending arbitration,

evaluating the different groups of parties according to their separate motions.  Second, the Court will address the motions to dismiss.  Finally, the Court will briefly address the request by the non-moving defendants to join in the motions to dismiss by the Bank Defendants and the other moving Defendants.

### A.  Arbitration Motions

The Law Firm Defendants and the Bank Defendants both move to compel arbitration, and the other moving Defendants move to stay the action as to them pending the resolution of the arbitration. As there are two contracts at issue with two different arbitration clauses, the Court will evaluate the Law Firm Defendants' arbitration clause in the ARA first before then turning to the Bank Defendants' arbitration clause in the AADS. The standard of evaluating the two clauses is the same.

As the Court of Appeals has repeatedly emphasized, "the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1-16, provides that arbitration agreements are enforceable to the same extent as other contracts, and establishes a strong federal policy in favor of the resolution of disputes through arbitration." Morales v. Sun Constructors, Inc., 541 F.3d 218, 221 (3d Cir. 2008) (internal quotations and citations omitted).  "Section 2 of the . . . FAA makes agreements to arbitrate 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." AT&T Mobility LLC v.

Concepcion, -- U.S. --, 131 S. Ct. 1740, 1744 (2011) (quoting 9 U.S.C. § 2).

There are, therefore, only two threshold questions that the Court must answer when deciding a motion to compel arbitration: "(1) whether a valid agreement to arbitrate exists and (2) whether the particular dispute falls within the scope of that agreement." Trippe Mfg. Co. v. Niles Audio Corp., 401 F.3d 529, 532 (3d Cir. 2005).

       1.  Arbitration Clause in the ARA

The Law Firm Defendants claim that the arbitration clause in the ARA, which Plaintiff signed, establishes an agreement to arbitrate all of Plaintiff's claims against them, as all of her claims relate to their "performance of any services related to" the ARA.

Plaintiff opposes enforcement of the ARA arbitration clause for a laundry-list of reasons: (1) it was obscurely located, (2) it was not clear that Plaintiff was waiving her right to a jury trial, or her right to discovery, or fees and costs, (3) it used insufficiently broad language such that it is not clear that Plaintiff's dispute falls within the scope of the agreement, and (4) it is unconscionable.

For reference, the text of the ARA's arbitration clause in full is reproduced below.  The Clause was located on the fourth page of the ARA, four paragraphs up from (and on the same page

as) the signature line, and began with a bolded paragraph
heading.

> **Arbitration:**
> In the event of any claim or dispute between
> Client and LHDR related to the Agreement or
> related to any performance of any services
> related to this Agreement, such claim or
> dispute shall be submitted to binding
> arbitration upon the request of either party
> upon the service of that request. The parties
> shall initially agree on a single arbitrator
> to resolve the dispute. The matter may be
> arbitrated either by the Judicial Arbitration
> Mediation Service or American Arbitration
> Association, as mutually agreed upon by the
> parties or selected by the party filing the
> claim. The arbitration shall be conducted in
> either the county in which Client resides, or
> the closest metropolitan county. Any decision
> of the arbitrator shall be final and may be
> entered into any judgment in any court of
> competence [sic] jurisdiction. The conduct of
> the arbitration shall be subject to the then
> current rules of the arbitration service. The
> costs of arbitration, excluding legal fees,
> will be split equally or be born by the losing
> party, as determined by the arbitrator shall
> decide [sic]. The parties shall bear their own
> legal fees.

Attorney Retainer Agreement ¶ XVIII, Bratter Cert. Ex. C.

The Court finds that this arbitration agreement is valid and
enforceable. The Court will accordingly grant the Law Firm
Defendants' motion to compel arbitration of Plaintiff's claims
against the Law Firm Defendants.

First, Plaintiff's argument that the ARA is an
unconscionable adhesion contract is without merit, since such
claims, which target the contract as a whole (rather than the

arbitration clause itself), are themselves arbitrable.  Buckeye
Check Cashing, Inc. V. Cardegna, 546 U.S. 440, 449 (2006) ("a
challenge to the validity of the contract as a whole, and not
specifically to the arbitration clause, must go to the
arbitrator."). See also  JLM Industries, Inc. v. Stolt-Nielsen
SA, 387 F.3d 163, 170 (2d Cir. 2004).

Plaintiff's arguments regarding the unconscionability of the
arbitration clause do not clearly establish whether Plaintiff's
argument is that the ARA as a whole is unconscionable or whether
Plaintiff argues, in addition, that the terms of the arbitration
clause itself are unconscionable and therefore unenforceable.
Most of Plaintiff's arguments appear to be directed at the
contract as a whole (describing the contract as one of adhesion,
with unequal levels of sophistication and bargaining power,
e.g.).  However, Plaintiff also argues that the terms of the
arbitration clause are substantively unconscionable because they
subject Plaintiff to "multiple arbitration forums and locations"
and that, because the LHDR Defendants were lawyers negotiating a
contract to represent the Plaintiff, the fact that the
arbitration agreement limited Plaintiff's rights to statutory
claims and counsel fees was substantively unconscionable as well.

Defendant responds that there is no evidence of either
procedural or substantive unconscionability in the clause.  The
terms of the clause are even-handed, in that the location of the

arbitration is convenient to Plaintiff, rather than Defendants; the choice of the arbitrator is mutually agreed by the parties, and the arbitration service could be chosen by the Plaintiff in filing the claim.

Regarding Plaintiff's next arguments against enforcement of the arbitration clause, its alleged obscurity and lack of clarity, the Court interprets these arguments to attack the contention that Plaintiff entered into an arbitration agreement. Plaintiff argues that New Jersey law requires that contractual waivers of jury trials, discovery, and fees, when located in contracts of adhesion, are required to be highlighted and more obviously and clearly stated than the clause in the ARA. See, e.g., Rockel v. Cherry Hill Dodge, 368 N.J. Super. 577 (App. Div. 2004). Defendants respond that, to the extent that Plaintiff argues that special notice and clarity rules are necessary under New Jersey law to enforce arbitration agreements, that proposition is squarely rejected by the Supreme Court's recent opinion in AT&T Mobility LLC v. Concepcion, -- U.S. --, 131 S. Ct. 1740, 1746 (2011) (declaring that the FAA preempts state-law defenses to arbitration agreements "that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.") See also id. at 1748 ("nothing in it [Section 2 of the FAA] suggests an intent to preserve state-law rules that stand as an obstacle to the

accomplishment of the FAA's objectives.").

Plaintiff argues that the New Jersey requirement of greater clarity and obviousness for arbitration clauses, essentially a notice requirement, survives AT&T Mobility, which explicitly recognized that "states remain free to take steps addressing the concerns that attend contracts of adhesion -- for example, requiring class-action-waiver provisions in adhesive arbitration agreements to be highlighted."  AT&T Mobility, 131 S. Ct. at 1750 n.6.  This footnote has been recognized by the New Jersey Appellate Division as preserving the existing state court rules governing the clarity and obviousness of such waivers.

> In the aftermath of AT&T Mobility, state courts remain free to decline to enforce an arbitration provision by invoking traditional legal doctrines governing the formation of a contract and its interpretation.  Applying such core principles of contract law here, we must decide whether there was mutual assent to the arbitration provisions in the [defendant car dealership's] contract documents.  As part of that assessment, we must examine whether the terms of the provisions were stated with sufficient clarity and consistency to be reasonably understood by the consumer who is being charged with waiving her right to litigate a dispute in court.

NAACP of Camden County East v. Foulke Management Corp., 421 N.J. Super. 404, 428 (App. Div. 2011).

Thus, the Court must determine to what extent New Jersey courts require heightened specificity and clarity in consumer arbitration agreements, and whether the ARA signed by Plaintiff

27

falls afoul of that rule.

Plaintiff argues that cases such as Rockel, 368 N.J. Super. 577, and Gras v. Associates First Capital Corp., 346 N.J. Super. 42 (App. Div. 2001) recognize a standard of clarity and obviousness that is not met by the arbitration provision in the ARA.  In Rockel, an arbitration provision was deemed to be unenforceable because the various contract documents signed by the consumer included multiple, contradictory arbitration provisions, and the provisions were located in small print in an obscure portion of the contract.  Rockel at 586-87.  The Appellate Division distinguished the provisions in Rockel, which it found to be an insufficiently clear manifestation of a waiver of statutory rights and jury trial rights, with the arbitration provision in Gras v. Associates First, 346 N.J. Super. at 57, where the Appellate Division found the language of an arbitration agreement "specific enough to inform plaintiffs that they were waiving their statutory rights to litigation in a court" because, in part, the language of the agreement explicitly stated that the provision limited the plaintiff's right to a court action.  Thus, Plaintiff in the instant action argues that any arbitration provision less explicit and obvious than the provision enforced in Gras must be held void as an insufficient waiver of the plaintiff/consumer's right to a jury trial.

However, the Court notes, that other Appellate Division

decisions have enforced contested arbitration clauses that are considerably less expansive and explicit than that approved in Gras.  See, e.g., Griffin v. Burlington Volkswagen, Inc., 411 N.J. Super 515, 518 (App. Div. 2010) (approving arbitration provision that did not explicitly refer to a "jury trial" waiver); Kho v. Cambridge Management Group, LLC, N.J. Super., 2010 WL 4056858 (App. Div., Aug. 4, 2010) (approving arbitration provision that did not explicitly refer to waiving right to resolve disputes in court action, or explicitly refer to waiving statutory claims).  The clearest statement of a rule regarding the clarity/explicitness requirement in New Jersey Courts appears to be that found in Curtis v. Cellco Partnership, 413 N.J. Super. 26, 33 (App. Div. 2010).  An arbitration provision will be upheld if "[t]he arbitration provisions are sufficiently clear, unambiguously worded, satisfactorily distinguished from the other Agreement terms, and drawn in suitably broad language to provide a consumer with reasonable notice of the requirement to arbitrate all possible claims arising under the contract."  Id.

Applying this rule to the instant dispute, then, the Court finds that the arbitration provision located in the ARA narrowly survives this level of scrutiny.  The arbitration clause was plainly written, contained within the main body of the contract rather than hidden in fine print, bore a bolded paragraph heading, and was mere inches away from Plaintiff's signature

29

line.  While the provision did not explicitly state that the
Plaintiff agreed to waive any right to try her dispute in a court
of law, the provision clearly states that the arbitrator (and not
a court) would "resolve the dispute."  The Court finds that such
language is, in the circumstances of this case, minimally
sufficient.

Next, Plaintiff also argues that the disputes at issue do
not fall within the scope of the clause.  Plaintiff objects to
the fact that the arbitration clause does not include the
"arising out of or arising under" language which is "normally
given broad construction by the courts."  The Court likewise
finds this argument unpersuasive.

"Courts have generally read the terms 'arising out of' or
'relating to' a contract as indicative of an 'extremely broad'
agreement to arbitrate any dispute relating in any way to the
contract."  Griffin v. Burlington Volkswagen, Inc., 411 N.J.
Super 515, 518 (App. Div. 2010).  A dispute or claim "relates to"
the contract whenever the dispute requires "reference to the
underlying contract." Id. at 520.  The Court finds that the ARA's
arbitration clause, which encompasses "any claim or dispute
between Client and LHDR related to the Agreement or related to
any performance of any services related to this Agreement" is
sufficiently broad and encompasses the Plaintiff's claims, which
relate to the Law Firm Defendants' actions pursuant to the ARA.

30

Plaintiff claims that Defendants, by providing the debt
negotiation services to which Plaintiff contracted in the ARA,
violated a New Jersey Statute, and that their performance of the
contracted-for (and allegedly illegal) services violated the CFA,
and various other state and common-law causes of action.  These
claims relate to the Law Firm Defendants' performance of a
service related to the ARA.  Plaintiff's rights under these
statutes and other law may be determined by an arbitration.

Finally, the Court finds that the ARA's arbitration
provision is enforceable as to all of the Law Firm Defendants.
Defendants argue that, in addition to LHDR (the contracting
party) the ARA's arbitration clause also governs parties
sufficiently related to LHDR under the contract, which includes
Eclipse and the individual officers of the two organizations.  It
is well settled that "agency and contract principles enable
courts to consider nonsignatories as parties to the arbitration
provision."  <u>Crawford v. West Jersey Health Sys.</u>, 847 F. Supp.
1232, 1243 n.14 (D.N.J. 1994).  Even were the Court to consider
Eclipse and the individual Law Firm Defendants to be "independent
contractors" of LHDR (as Plaintiff suggested for the first time
in oral argument), the Court would still find that the ARA
arbitration agreement covered Plaintiffs' claims against such
defendants under the "equitable estoppel" doctrine discussed in
<u>Bruno v. Mark MaGrann Assoc.</u>, 388 N.J. Super. 539, 548 (App. Div.

31

2006) (holding that claims against independent contractor of
signatory to arbitration agreement must be arbitrated because
such claims were sufficiently "closely aligned" with claims
against the contracting party).

The Court will therefore enforce the arbitration agreement
and grant the Law Firm Defendants' motion to compel.  As a
result, the Court will deny the Law Firm Defendants' motion to
dismiss as moot.

2. <u>Arbitration Clause in the AADS</u>

The Bank Defendants also move to compel arbitration,
claiming that, like with the Law Firm Defendants, Plaintiff
agreed to arbitrate all disputes with RMBT and Global (and their
agents) by signing the SPAA, which included by reference the
AADS.

Plaintiff opposes this motion on mainly the same grounds as
she opposes the Law Firm Defendants' motion.  However, Plaintiff
additionally argues that there is no evidence that Plaintiff
actually agreed to arbitrate with Global and RMBT because she
signed the SPAA before receiving a copy of the AADS.

Defendants respond, first, that there is no evidence in the
record supporting Plaintiff's claim that she did not receive the
AADS and its arbitration clause until after she had signed and
returned the SPAA.  Defendants point to the Amended Complaint,
which does not affirmatively allege that Plaintiff had not seen

32

the AADS prior to signing the SPAA in September of 2009.  Indeed, Defendants argue, the Amended Complaint only alleges that Plaintiff received documents (that she electronically signed and returned) by e-mail, which included "a Special Purpose Account application, and account agreement establishing a Special Purpose Account with Rocky Mountain Bank and Trust . . . ."  Am. Compl. ¶ 23(b).  Defendants argue that, by referring to both the SPAA and an "account agreement", Plaintiff has affirmatively alleged that she received the AADS as well as the SPAA prior to electronically signing the SPAA.

Plaintiff responds that the Amended Complaint does not affirmatively allege she received the AADS, merely by using the phrase "account agreement" in paragraph 23(b).  Plaintiff argues that the phrase "Special Purpose Account application, and account agreement" merely refers to the SPAA itself, and does not refer to the AADS, which she claims only arrived later.  Plaintiff further argues that evidence in the record permits the Court to determine that Plaintiff first received the AADS in October along with several other documents sent through first class mail.  Plaintiff claims that the evidence supporting this proposition is seen in the encoded header line attached to the top of each document she received via e-mail in September of 2009.  Those documents did not include the AADS, she argues, demonstrated by the fact that she is unable to produce a copy of the AADS with

such an encoded header line.  <u>See</u> Combined Appendix A129-A137
(including the ARA and the SPAA, but not the AADS).  The Court
concludes that the record is sufficient to establish that
Plaintiff did not receive the AADS in her initial collection of
documents sent via e-mail, and further concludes that Plaintiff's
vague reference to "agreement" in the Amended Complaint ¶ 23(b)
does not clearly contradict this evidence, as the sentence could
be interpreted to mean that Plaintiff was characterizing the
"Special Purpose Account" document as both an application and an
agreement, which she signed and returned.

Defendants next argue that the SPAA that Plaintiff signed
and returned in September of 2009 did not form an agreement,
because the SPAA (an application) was merely an offer that only
formed an agreement upon Defendant RMBT's acceptance of
Plaintiff's offer.  Thus, Defendants argue, Plaintiff received
the AADS prior the formation of the contract, which only occurred
later when RMBT approved her application, sent her the AADS,
among other documents, and Plaintiff's later compliance and
performance of the terms of the agreement.

The elements of a contract are, simply, offer and acceptance
supported by valuable consideration.  <u>Devaney v. L'Esperance</u>, 195
N.J. 247, 261 (2008).  Thus, whether the SPAA constituted merely
an offer by Plaintiff to form a contract, or an acceptance by
Plaintiff of specific terms offered by Defendants dictates the

34

point at which an agreement was formed between the parties in
this case.  In the circumstances of the instant case, the Court
concludes that the SPAA that was sent to Plaintiff in September
of 2009 constituted an offer to form an agreement that Plaintiff
accepted by electronically signing and returning the form.  An
offer is, simply, "the manifestation of willingness to enter into
a bargain, so made as to justify another person in understanding
that his assent to that bargain is invited and will conclude it."
Rest. 2d Contracts § 24.

     In the case of the SPAA, Plaintiff alleges that she had
called Defendant JG, spoke with Defendant Gavalas, and indicated
her desire to enter into a debt reduction program.  Am. Compl. ¶
21.  She further alleges that she was later contacted by Gavalas
and told that she had been accepted into the program and
discussed particulars of the program that she wanted to pursue.
Id. § 22.  After settling on specific details, Plaintiff
received via e-mail a collection of electronic documents, in an
e-mail message with the subject line "Debt Settlement Service
Agreement."  Combined Appendix. A128.  The attached documents all
appeared to exhibit a request that Plaintiff accept the
particular terms, contained within each.  The SPAA itself begins
with the sentence "I hereby apply for and agree to establish a
special purpose account with Rocky Mountain Bank . . ."  Id.
A130.  There are no further steps required of Plaintiff after she

35

has electronically signed and submitted the completed form.  The form indicates that there nothing for RMBT to do once the completed SPAA has been submitted other than opening her account and begin accepting her deposits.

In these circumstances, the Court concludes that by completing and returning the SPAA, Plaintiff accepted RMBT's offer to open an account, thereby forming an agreement.  See Klos v. Mobil Oil Co., 55 N.J. 117 (1969) ("In short, there is nothing for a cardholder or [defendant] American to do after the application is made other than the latter's purely mechanical operation of processing the matter.  In these circumstances we believe that the sending of the letter, brochure, and application form constituted an offer by American which could be accepted by Klos.").  Consequently, the Court concludes that the agreement to open an SPA was formed when Plaintiff signed and returned her SPAA, and that she did so before having been provided with the terms contained in the AADS, including the arbitration clause.

Defendants next argue that even if Plaintiff did not receive the AADS until approximately three weeks after the SPA agreement was formed, the fact that she signed the SPAA, with its incorporation clause referring to the AADS and its acknowledgment and agreement to be bound by those conditions in the AADS, and because she did not object to the arbitration clause when she did later receive the AADS, and continued to perform under the SPAA

36

after having received it, she manifested her agreement sufficiently to be later bound by the AADS.

Plaintiff cites to a Ninth Circuit case involving Defendant Global in a virtually identical fact pattern, in which the plaintiff had not received the AADS with its arbitration agreement prior to signing the SPAA, where the Ninth Circuit affirmed the District Court's conclusion that Plaintiff had not agreed to arbitration.  Carlsen v. Global Client Solutions, L.L.C., 423 F. App'x 697 (9th Cir. 2011). ("The district court did not clearly err in finding that there was no agreement to arbitrate.").  The District Court in that action held that "It goes without saying that a person should at least have an opportunity to review the terms of a contract before deciding to execute a document which binds him or her to those terms." Carlsen v. Global Client Solutions, L.L.C., 2010 WL 786254 at *3 (E.D. Wash., Mar. 4, 2010).

Defendants, by contrast, cite to a different case, also involving Defendant Global, where a New Jersey court similarly was forced to confront the question of whether a Plaintiff who signed the SPAA, with its clear incorporation clause, prior to receiving the AADS manifested asset to be bound in the unpublished case of Festa v. Capital One Bank, L-4851-10 (unpublished) Sup. Ct. Law Div., Apr. 21, 2011. (Bratter Decl. Ex. A, Docket Item 73).  There, again under virtually identical

facts as here, the third-party Plaintiff Frank Festa claimed that
Global's arbitration agreement was not enforceable because he had
not seen it prior to signing the SPAA.  The Court rejected
Plaintiff's argument.

> Whether or not Festa actually read or
> understood the 'Account Agreement and
> Disclosure Statement' at the time that he
> signed the Application is irrelevant. Legally,
> when Festa signed the Application, he
> acknowledged that he accepted the terms and
> provisions therein, including the
> incorporation of the 'Account Agreement and
> Disclosure Statement' and its arbitration
> clause.  See Restatement (Second) of the Law
> of Contracts § 211.  Therefore if Festa signed
> the Application, he is legally bound by the
> terms contained therein, whether or not he
> truly understood what he was signing.

Id. at *4.[7]

Plaintiff argues in her sur-reply that Festa was wrongly
decided because it incorrectly applied the law regarding
incorporation clauses, citing to Alpert v. Goldberg, 410 N.J.
Super. 510 (App. Div. 2009), for the proposition that greater
specificity is required to incorporate absent clauses into a
contract.  Defendants respond in their sur-sur-reply that Alpert

---

[7]  The Court notes that Defendants Global and RMBT seem to
be accustomed to making this argument that the late-arriving
conditions in the AADS should bind the consumer, perhaps because
they so frequently fail to send a copy of the AADS until after
the consumer/debtor has already committed to its terms via the
incorporation clause in the SPAA.  See, e.g., Davis v. Global
Client Solutions, LLC, 2011 WL 4738547 at *1 (W.D. Ky. Oct. 7,
2011); Webster v. Freedom Debt Relief, LLC, Civ. No. 10-1587
(N.D. OH., July 17, 2011) (Magistrate Recommendation adopted by
District Court on August 4, 2011, 2011 WL 3422872).

is distinguishable because it was limited to incorporation
clauses in an attorney/client relationship signing a retainer
agreement, which is not present here.

In Alpert, a law firm sued its former client for unpaid
legal fees and various costs that were included in a "master
retainer agreement" incorporated by reference into the
client/defendant's retainer agreement but not expressly described
in the agreement. Id. at 523-24. On appeal, the appellate
division held that the terms included in the "master retainer
agreement" could not be enforced because they were not properly
incorporated into the agreement. "In order for there to be a
proper and enforceable incorporation by reference of a separate
document, the document to be incorporated must be described in
such terms that its identity may be ascertained beyond doubt and
the party to be bound by the terms must have had 'knowledge of
and assented to the incorporated terms.'" Id. at 533.

The Court disagrees with Defendants, finding that Alpert is
not distinguishable on the basis of the fact that the plaintiff
seeking to impose the incorporated terms was an attorney. The
Alpert court was clear that the proposition regarding
incorporation of absent terms by reference was a question of
general contract law, not specific to the attorney-client
relationship. See Id. at 534 (citing cases from other
jurisdictions repeating the requirement, in contexts unrelated to

39

the attorney-client relationship).

Moreover, the Court disagrees with the unpublished decision in Festa, which in any event is not a decision of the New Jersey Supreme Court and is not binding upon this federal Court in determining New Jersey law.  Festa's premise that an arbitration clause may be contained in an undisclosed document that has been incorporated into a contract only by reference is incorrect.  It is clear that, at the very minimum, an arbitration clause must be made known to the contracting party in all detail when the contract is made.  An undisclosed provision for arbitration does not comply with the minimal requirements of being "sufficiently clear, unambiguously worded, satisfactorily distinguished from the other Agreement terms, and drawn in suitably broad language to provide a customer with reasonable notice of the requirement to arbitrate all possible claims arising under the contract," as required by Curtis v. Cellco Partnership, supra, 413 N.J. Super. at 33.

Applying the rule from Alpert, the Court finds that the arbitration clause in the AADS was not effectively incorporated into the SPAA that Plaintiff signed.  While the SPAA clearly and unambiguously referred to the AADS by name (such that its "identity may be ascertained beyond doubt"), the party to be bound, Guidotti, does not appear to have had "knowledge of and assented to the incorporated terms."  If, as Defendants concede

40

is possible, Plaintiff had never seen the AADS at the time she applied for the SPA, she could not have had knowledge of the existence of the arbitration clause or its specific conditions, even if she assented to its incorporation.  Thus, the Court finds that the clause was not properly incorporated into the SPAA, and cannot now bind Plaintiff to arbitrate her claims against the Bank Defendants.[8]

    3.  <u>Motion to Stay</u>

As Court has decided to grant the Law Firm Defendants' motion to compel arbitration but deny the Bank Defendants' motion, the Court must therefore confront whether to grant the remaining Moving Defendants' motion to stay the action pending the arbitration of the Law Firm Defendants' claims.

The decision to grant a stay pending arbitration of related claims and parties is within the Court's discretion.  <u>Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.</u>, 460 U.S. 1, 20 n.23 ("in some cases, of course, it may be advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration.  That decision is one left to the district court . .

---

[8] Additionally, even if the Court were inclined to find the arbitration clause effectively incorporated, the Court would find that the application of the absent terms, in circumstances raising the inference that it was a business practice of the Bank Defendants to withhold the AADS and its terms from the contracting consumer until after the consumer had signed the SPAA (based only on the cases cited by the Parties in this dispute, Plaintiff Guidotti appears to be the <u>fifth</u> customer so treated by these Defendants), would be unconscionable.

. as a matter of its discretion to control its docket."). Courts in this district that have considered the issue have previously entered such stays. "Where significant overlap exists between parties and issues, courts generally stay the entire action pending arbitration." Crawford v. West Jersey Health Sys., 847 F. Supp. 1232, 1243 (D.N.J. 1994) (collecting cases).

Section 3 the FAA provides District Courts with the authority to enter a stay in such circumstances. 9 U.S.C. § 3. The Court's primary considerations are fairness to the parties and judicial efficiency. See CTF Hotel Holdings, Inc. v. Marriott Intern., Inc., 381 F.3d 131, 139 (3d Cir. 2004). In the instant case, the Court concludes that on balance, the considerations of fairness to the parties and judicial efficiency weigh against staying the balance of Plaintiff's claims in this Court pending her arbitration of her claims with the Law Firm Defendants. As Plaintiff's claims against the Law Firm Defendants relates to a different contract and distinct services and payments, any risk of res judicata or collateral estoppel is minimal in this action. Additionally, the Court concludes that staying Plaintiff's claims against the other Defendants in this Court not subject to a valid arbitration clause invites problems of staleness, litigation fatigue, spoliation of evidence, and potential insolvency of the parties. Consequently, the Court declines to exercise its discretion to enter a stay of

Plaintiff's claims pending resolution of her arbitration with the Law Firm Defendants.  The Court can revisit this issue if future events warrant a temporary stay.

**B. Motions to Dismiss For Lack of Personal Jurisdiction**

Having concluded that the Law Firm Defendants' motion to compel arbitration will be granted, their motion to dismiss will be denied as moot.  However, as the Court has decided to deny the Bank Defendants' motion to compel and the Remaining Defendants' motion to stay, it will now determine which, if any, Defendants and claims should be dismissed pursuant to Fed. R. Civ. P. 12(b)(2) or 12(b)(6).

1.   Personal Jurisdiction Standard of Review

Defendants move to dismiss on the grounds of lack of personal jurisdiction and for failure to state a claim.  The Court will begin by examining the motions to dismiss for lack of personal jurisdiction.

To exercise personal jurisdiction over a defendant, a federal court must undertake a two-step analysis.  First, the court must apply the relevant state long-arm statute to see if it permits the exercise of personal jurisdiction.  See Pennzoil Prods. Co. v. Colelli & Assocs., Inc., 149 F.3d 197, 200 (3d Cir. 1998).  Next, the court must determine whether exercising personal jurisdiction would violate federal due process.  See IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 259 (3d Cir. 1998);

Pennzoil, 149 F.3d at 200.  In New Jersey, this inquiry is
combined into a single step because the state's long-arm statute,
N.J. Civ. Prac. R. 4:4-4, permits the exercise of personal
jurisdiction to the fullest limits of due process permitted by
the Fourteenth Amendment.  See DeJames v. Magnificence Carriers,
Inc., 654 F.2d 280, 284 (3d Cir. 1981); Decker v. Circus Circus
Hotel, 49 F. Supp. 2d 743, 745 (D.N.J. 1999).

Once a party raises the defense of lack of personal
jurisdiction, the burden is on the plaintiff to show that the
defendant himself has purposefully directed his activities toward
the residents of the forum state or otherwise "purposefully
availed itself of the privilege of conducting activities within
the forum State, thus invoking the benefits and protections of
its laws."  See Hanson v. Denckla, 357 U.S. 235, 253 (1958); see
also Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985).

A plaintiff may not rely on the pleadings alone in order to
withstand a motion to dismiss for lack of personal jurisdiction.
See Stranahan Gear Co., Inc. v. NL Indus., 800 F.2d 53, 58 (3d
Cir. 1986).  Therefore, the plaintiff must come forward with
facts sufficient to establish by a preponderance of the evidence
that the district court has personal jurisdiction over the
defendant.  Time Share Vacation Club v. Atlantic Resorts, Ltd.,
735 F.2d 61, 65 (3d Cir. 1984); see also IMO Indus., 155 F.3d at
257 ("the plaintiff bears the burden of proving that personal

44

jurisdiction is proper"); Gehling v. St. George's Sch. of Med., 773 F.2d 539, 542 (3d Cir. 1985) ("[P]laintiff bears the burden of establishing with reasonable particularity sufficient contacts between the defendant and the forum state to support jurisdiction.").

    2.  <u>Bank Defendants</u>

The Bank Defendants begin their motion to dismiss by arguing that Plaintiff has failed to allege or point to evidence supporting the Court's exercise of personal jurisdiction over these four out-of-state defendants.  Defendants argue that the mere fact that Plaintiff applied for a bank account at RMBT does not indicate sufficient minimum contacts to establish specific jurisdiction over any of the Defendants in this group.

Plaintiff responds that Defendant RMBT is party to a contract with Plaintiff in the state of New Jersey. Additionally, Plaintiff claims that Defendants Global and RMBT admit to having approximately 2,000 New Jersey clients, citing, apparently, to the Notice of Removal in this action. [Docket Item 1.]

Defendants respond that the notice of removal was filed solely by LHDR, and is therefore not an admission by any of the Bank Defendants.  Whether or not Defendant LHDR has 2,000 New Jersey clients is not determinative of whether the Bank Defendants had sufficient contacts with New Jersey.

Additionally, Defendants cite to Arms, Inc. v. Sedona Research, Inc., Civ. No. 93-3601 1993 WL 534361 at *3 (D.N.J. Dec. 16, 1993) for the proposition that a "contract between a forum resident and an out-of-state party will not automatically establish sufficient contacts with the forum to justify in personam jurisdiction." (Citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 478 (1985)).

This issue is a close question, as to Defendants Global and RMBT. Merely having accepted Plaintiff's application for a bank account would not seem to be enough to establish the "purposeful availment" standard of personal jurisdiction. However, Plaintiff alleges greater contacts with the forum state than merely the existence of a contract. In the Amended Complaint, she clearly alleges that Defendant Gavalas and JG, working within New Jersey, "would receive phone calls in response to the advertising and marketing by LHDR, Eclipse, Global, Rocky and JG from inquiring debtors. JG received calls not only from New Jersey residents such as the lead plaintiff, but from different parts of the country as the phone calls were transferred around the country on a round robin basis to other front-end entities such as JG." Am. Compl. ¶ 65. This allegation would seem to indicate that Global and RMBT had affirmatively reached an agreement with JG to channel leads from New Jersey, among other states, toward them, thereby purposefully availing themselves of the forum sufficient

46

to satisfy due process.

As Plaintiff bears the burden of not only alleging sufficient contacts, but by submitting evidence sufficient to prove such contacts by a preponderance, she must do more than merely allege such a scheme. The Court finds, however, that Plaintiff has submitted minimally sufficient evidence to meet this burden. In support of the contention that Global and RMBT were purposefully availing themselves of the forum, Plaintiff attaches deposition testimony from Global and RMBT officers Hendrix and McClure, taken in a different civil action. Pl.'s Combined Appendix, A311-A389. In those depositions, McClure, speaking on behalf of Defendant RMBT admitted paying a marketing fee to Global to attract debt settlement customers, such as Plaintiff, outside of RMBT's geographic area. McClure Dep. A333:20-A335:9. Global, in turn, would solicit referral of such clients, or "leads" from debt settlement companies such as LHDR, aware that such companies were soliciting clients from nearly any state in the nation, including states with regulatory restrictions on the business. Hendrix Dep. A382:9-384:9. Finally, Plaintiff attaches a sample marketing and client-referring agreement produced by LHDR, that indicated that it would actively solicit and accept business from consumers in New Jersey, among other states. LHDR Marketing Agreement, Combined Appendix at A112. The Court finds that this evidence is

sufficient to meet Plaintiff's burden of supporting her allegations of purposeful availment sufficient to meet the requirements of due process as to Defendants Global and RMBT.

As to Defendants Hendrix and McClure, Plaintiff has not sufficiently alleged contacts with New Jersey as to them individually to satisfy due process, and the two will therefore be dismissed for lack of personal jurisdiction.  Plaintiff's allegations of personal jurisdiction as to Hendrix and McClure are exclusively based on their actions as out-of-state corporate officers, rather than as acting in their individual capacity.  However, "jurisdiction over ... [individual] defendants does not exist simply because they are agents or employees of organizations which presumably are amenable to jurisdiction in" the forum state.  Nicolas v. Saul Stone & Co., 224 F.3d 179, 184 (3d Cir. 2000).  Instead, "[e]ach defendant's contacts with the forum state must be assessed individually."  Id. at 781 n.13.  Thus, Plaintiff's claim that Defendants Hendrix and McClure are subject to this Court's in personam jurisdiction simply because they acted as officers of Global and RMBT is insufficient.

To the extent that Plaintiff argues that personal jurisdiction can be established over these individual defendants on the basis of their vicarious or conspiracy liability with the other in-forum Defendants the Court observes that New Jersey has never recognized a "conspiracy theory of jurisdiction."  See

48

Lasala v. Marfin Popular Bank Public Co., Ltd., Civ. No. 09-968, 2010 WL 715482 at *3 (D.N.J. Mar. 1, 2010). Thus, the Court will dismiss Hendrix and McClure for lack of personal jurisdiction.

### 3.   The Remaining Defendants

As to the remaining moving Defendants, four of the five defendants move to dismiss for lack of personal jurisdiction (LSSG, CMIT, JEM, and LYNCH, but not LHP). The Court notes that Plaintiff has alleged nothing more than a relationship via conspiracy or vicarious contacts with the forum state as to any of these entities. The Court will therefore grant the motion to dismiss as to Defendants LSSG, CMIT, JEM and LYNCH.

### C. Motions to Dismiss For Failure to State a Claim

Finally, the Court turns to the motions to dismiss for failure to state a claim pursuant to Fed. R. 12(b)(6). As the Court has already determined that all moving Defendants should be dismissed from the action save the Bank Defendants Global and RMBT as well as Defendant LHP, which did not move to dismiss for lack of personal jurisdiction, the Court will now turn to assess whether Plaintiff's Amended Complaint sufficiently pleads any cause of action as to Global, RMBT and LHP sufficient to withstand Defendants' 12(b)(6) motion.

### 1.   Rule 12(b)(6) Standard of Review

In order to give defendant fair notice, and to permit early dismissal if the complained-of conduct does not provide adequate

49

grounds for the cause of action alleged, a complaint must allege, in more than legal boilerplate, those facts about the conduct of each defendant giving rise to liability.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007); Fed. R. Civ. P. 8(a) and 11(b)(3).  These factual allegations must present a plausible basis for relief (i.e., something more than the mere possibility of legal misconduct).  See Ashcroft v. Iqbal, 129 S.Ct. 1937, 1951 (2009).  In its review of a motion to dismiss pursuant to Rule 12(b)(6), Fed. R. Civ. P., the Court must "accept all factual allegations as true and construe the complaint in the light most favorable to the plaintiff." Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008) (quoting Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).

The assumption of truth does not apply, however, to legal conclusions couched as factual allegations or to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Iqbal, 129 S.Ct. at 1949.

The Court, in evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, may consider the complaint, exhibits attached thereto, matters of public record, and undisputedly authentic documents if the plaintiff's claims are based upon those documents.  See Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993).

2.   The Bank Defendants Global and RMBT

The Bank Defendants move to dismiss on the grounds that Plaintiff fails to state a claim for several reasons.  The first argument in this area is that the Global and RMBT were not "debt adjusters" sufficient to be sued under the NJDACCA, as defined under N.J. Stat. Ann. § 17:16G-1(c)(1).

> "Debt adjuster" means a person who either (a) acts or offers to act for a consideration as an intermediary between a debtor and his creditors for the purpose of settling, compounding, or otherwise altering the terms of payment of any debts of the debtor, or (b) who, to that end, receives money or other property from the debtor, or on behalf of the debtor, for payment to, or distribution among, the creditors of the debtor.

Id.

Defendants argue that they do not fit the definition of debt adjusters because they were not acting as intermediaries between Plaintiff and her creditors.  This is a misreading of the statute, which clearly states that one can be a debt adjuster, even without being an intermediary, so long as one is receiving money from the debtor to pay creditors "to that end", meaning for the purpose of adjusting a debt.  A person who, "to that end [for the purpose of settling, compounding, or otherwise altering the terms of payment on behalf of the debtor], receives money or other property from the debtor, or on behalf of the debtor, for payment to, or distribution among, the creditors of the debtor."  Id.  Defendants' insistence on reading the requirement of being

51

an intermediary into the statute is unnecessary and contrary to
the structure of the statute.  The Court finds that Plaintiff has
sufficiently alleged that Defendants RMBT and Global received
Plaintiff's money; the purpose of receiving Plaintiff's money was
to effectuate Plaintiff's debt negotiation plan with LHDR and
Eclipse, with the eventual intent that the money be distributed,
in part, among Plaintiff's creditors.  The Court finds that these
allegations are sufficient to meet the statutory definition of
"debt adjuster" under N.J. Stat. Ann. § 17:16G-1(c)(1)(b).

Defendants additionally argue that Plaintiff has
insufficiently alleged facts with sufficient particularity
necessary to state a claim under the CFA, but this argument is
continent on Defendants winning the NJDACCA "debt adjuster"
action.  Specifically, Defendants argue that Plaintiff fails to
allege unlawful conduct on the part of Defendants, a necessary
element of a CFA claim.  As the Court has determined that
Plaintiff's NJDACCA claim will not be dismissed, however, the
Court must also determine that Plaintiff has sufficiently alleged
unlawful conduct on the part of Defendants.  Thus, Defendants'
arguments regarding the CFA will also be dismissed.

Defendants also argue that Plaintiff fails to adequately
plead a NJ RICO claim because Plaintiff alleges only the
threadbare elements of the claim and Plaintiff did not include a
RICO case statement.  The Court disagrees that Plaintiff does not

adequately allege facts sufficient to state a claim for a violation of NJ RICO, noting that she has alleged that RMBT and Global were associated with and participated in the conduct of the affairs of an enterprise (namely, illegal debt adjustment activities), consisting of other Defendants such as LHDR and Eclipse, and that Global and RMBT participated through a pattern of racketeering activity, consisting of at least two related acts of acting as a debt adjuster.  To the extent Defendants claim that Plaintiff's failure to follow the model established in the District's RICO case statement, Defendants cite to no authority for the proposition that including a RICO case statement is a necessary requirement to state a claim under the New Jersey RICO statute.  Instead, a judge has discretion to require a plaintiff to file a RICO case statement pertaining to a federal RICO claim, in the form set forth in Appendix O of the Local Civil Rules, entitled "Optional RICO Case Order."  The Court therefore finds that Plaintiff adequately plead facts to state a claim under the NJ RICO at this stage in the litigation.

The Court likewise finds Plaintiff's common law causes of action to be sufficiently plead to state a cause of action. Thus, the Court will not dismiss Plaintiff's claims for civil conspiracy, unjust enrichment, breach of fiduciary duty, unconscionability, and common law fraud.

Finally, Defendants gesture somewhat weakly at a

constitutional challenge.  Defendants state merely that if the
New Jersey Debt Adjustment Act is applied to their activities in
this action, it would violate their rights under the Contract
Clause, the Dormant Commerce Clause, and the Equal Protection and
Due Process Clauses of the Fourteenth and Fifth Amendments.
Defendants provide no explanation in their brief how these
violations would come about, and cite no authority in support of
their challenge.  The Court will reject this challenge to the
application of the statute.

It is well established that the Contract Clause, found in
Article I, § 10 of the Constitution, does not apply to
prospective state action.  American Exp. Travel Rel. Svcs. Co.,
Inc. v. Sidamon-Eristoff, 755 F. Supp. 556, 611 (D.N.J. 2010).
Thus, because Plaintiff's alleged contracts with Defendants were
created long after the enactment of the New Jersey Debt
Adjustment Act, the clause offers no protection to Defendants.

Similarly, the Court denies Defendants' challenge to the
application of the statute under the Commerce Clause.  The Court
finds that Defendants have not established that the statute
burdens interstate commerce excessively, pursuant to Pike v.
Bruce Church, Inc., 397 U.S. 137, 142 (1970).

Likewise, the Court denies Defendants' challenge to the
application of the statute under the Due Process and Equal
Protection Clauses.

> When local economic regulation is challenged
> solely as violating the Equal Protection
> Clause, the Court consistently defers to
> legislative determinations as to the
> desirability of particular statutory
> discriminations. Unless a classification
> trammels fundamental personal rights or is
> drawn upon inherently suspect distinctions
> such as race, religion, or alienage, our
> decisions presume the constitutionality of the
> statutory discriminations and require only
> that the classification challenged by
> rationally related to a legitimate state
> interest.

<u>City of New Orleans v. Dukes</u>, 427 U.S. 297, 303 (1976). The

Supreme Court has previously upheld a similar debt adjusting

statute as the New Jersey statute on an equal protection

challenge. <u>See Ferguson v. Skrupa</u>, 372 U.S. 726, 732 (1963). As

Defendants offer no reason to distinguish <u>Ferguson</u>, nor any

argument why the Court should set aside the presumption of

constitutionality of this economic regulation, the Court will

deny Defendants' challenge to the statute under the Equal

Protection Clause.

### 3. <u>Rule 12(b)(6) as to Defendant LHP</u>

As to Defendant LHP, by contrast, the Court grants the

motion to dismiss for failure to state a claim as to it, for the

following reasons. Plaintiff makes no specific allegations about

actions taken by LHP, any agreement that it entered into with any

other Defendant, or other wrongs committed by LHP. The only

specific allegation as to LHP in the Amended Complaint is that it

shares an address with LHDR's New Jersey office, and that Nicely

is listed as a partner for the firm.  This is insufficient to state a claim under any of the asserted theories of recovery, and LHP will, consequently, be dismissed.

### D.  Non-moving Defendants

Finally, Defendants JG, Gavalas, Reliant Account Management LLC, and Chaya ask to join the motions to dismiss of the Bank Defendants and the other moving Defendants.  As stated on the record at the hearing on these motions, the Court will not permit these parties to join because Plaintiff has not been offered a chance to respond to specific reasons why these defendants should be dismissed, and the differences between these Defendants and the moving Defendants (e.g., their contacts with the forum, and the specific allegations in the Complaint as to each) are significant.

## IV.  CONCLUSION

For the reasons stated above, the Court will grant the Law Firm Defendants' motion to compel arbitration and consequently deny the Law Firm Defendants' motion to dismiss as moot.  Thus, the Court will dismiss from the action Defendants Legal Helpers Debt Resolution, LLC, Eclipse Servicing, Inc., Macey, Aleman, Searnes, Hyslip, Nicely, Duncan, and Hedaya.  The Court will deny, however, the Bank Defendants' motion to compel arbitration, having concluded that Plaintiff did not manifest an intention to

be bound by the arbitration clause because it was insufficiently incorporated into the agreement she signed.  The Court will, likewise, deny the remaining Defendants' motion to stay pending arbitration.

As to the motions to dismiss, the Court will grant the motions to dismiss for lack of personal jurisdiction as to Defendants Hendrix, McClure, Legal Services Support Group, LLC, Lynch Financial Solutions, JEM Group, and Century Mitigations. The Court will also grant the motion to dismiss for failure to state a claim of Defendant Legal Helpers, P.C.  However, the Court will deny the motion to dismiss for lack of personal jurisdiction or failure to state a claim by Defendants Global Client Solutions and Rocky Mountain Bank and Trust.  The accompanying order will be entered.


**December 20, 2011**                          **s/ Jerome B. Simandle**
Date                                      JEROME B. SIMANDLE
                                          United States District Judge


57