IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAWN GUIDOTTI, on behalf of herself and other class members similarly situated,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>LEGAL HELPERS DEBT RESOLUTION, L.L.C., et al.,<br><br>　　　　　　　Defendants. | HONORABLE JEROME B. SIMANDLE<br><br><br>Civil Action<br>No. 11-1219 (JBS/KMW)<br><br>**OPINION** |

APPEARANCES:

Joseph Michael Pinto, Esq.
POLINO AND PINTO, P.C.
720 East Main Street, Suite 1C
Moorestown, NJ 08057
　　　Counsel for Plaintiff

Shaji M. Eapen, Esq.
MORGAN, MELHUISH & ABRUTYN, ESQS.
651 W. Mt. Pleasant Avenue, Suite 200
Livingston, NJ 07039
　　　and
Richard W. Epstein, Esq.
Meredith H. Leonard, Esq.
Rebecca F. Brattner, Esq.
GREENSPOON MARDER, P.A.
200 East Broward Boulevard, Suite 1500
Ft. Lauderdale, FL 33301
　　　Counsel for Global Client Solutions, L.L.C., Rocky Mountain
　　　Bank and Trust of Colorado Springs, Colorado, and Eclipse
　　　Servicing, Inc.

**SIMANDLE, Chief Judge:**

**I.   INTRODUCTION**

This matter comes before the Court by way of Defendant Global Client Solutions, L.L.C.'s (hereinafter, "Global") and Rocky Mountain Bank and Trust's (hereinafter, "RMBT" and, collectively, "Defendants") renewed motion to compel arbitration of Plaintiff Dawn Guidotti's (hereinafter, "Plaintiff") claims in accordance with the arbitration provision of Defendants' Account Agreement and Disclosure Statement (hereinafter, the "AADS").[1] [Docket Item 155.]

In this putative class action involving, at one time, twenty-two defendants, Plaintiff generally alleges that she contracted with various law firm and bank defendants in hopes that such entities would negotiate with creditors to settle her consumer debts without forcing Plaintiff into bankruptcy. Rather than settling her outstanding financial obligations, however, Plaintiff alleges that the various defendants conspired to fleece her (and those similarly situated) of her remaining assets, without engaging in any debt negotiations on Plaintiff's behalf.

---

[1] On June 4, 2014, Defendants moved to strike Plaintiff's statement of material facts in opposition to the pending motion. [Docket Item 164].  For the reasons stated below, Defendants' motion to strike will be granted in part and denied in part.

Defendants performed a distinct function in this overall scheme, by purportedly maintaining and operating a "special bank account" out of which Plaintiff would pay the various defendants with whom Plaintiff contracted for "legal and debt negotiation" services, and into which Plaintiff would deposit funds ultimately intended "to be paid to her settling creditors." Guidotti v. Legal Helpers Debt Resolution, L.L.C., 866 F. Supp. 2d 315, 322 (D.N.J. 2011) (citation omitted).  Plaintiff's Complaint specifically identifies RMBT as the financial institution with which she opened this special purpose account, and Global as the "agent" processing the automatic fund transfers into, and/or automatic payments out of, such account. (Id.)

The Court has, on multiple occasions and in connection with various agreements, compelled Plaintiff to arbitrate her claims against certain defendants in this litigation.  See, e.g., Guidotti, 866 F. Supp. 2d at 342 (granting the nine "Law Firm Defendants' motion to compel arbitration), vacated & remanded on other grounds, 716 F.3d 764 (3d Cir. 2013); Guidotti v. Legal Helpers Debt Resolution, L.L.C., No. 11-1219, 2012 WL 3262435 (D.N.J. Aug. 7, 2012) (granting the motion of defendants J.G. Debt Solutions, L.L.C. and Joel Gavalas to compel arbitration).

With respect to Defendants, however, the Court's December 20, 2011 decision concluded that Plaintiff "signed and returned"

her Special Purpose Account Application (hereinafter, the "SPAA")—a document which referenced the AADS—prior to receiving the actual terms contained in the AADS, including its arbitration provision.  See Guidotti, 866 F. Supp. 2d at 334. Consequently, though "the SPAA clearly and unambiguously referred to the AADS" by name, the Court found that Plaintiff could not be compelled to arbitrate her claims because she lacked sufficient "knowledge of the existence of the arbitration clause or its specific conditions, even if she assented to its incorporation." Id. at 336.

In vacating the Court's December 20, 2011 Order, the Court of Appeals found that a genuine issue of material fact precluded a summary disposition, reliant upon the pleadings, on the issue of the parties' agreement, if at all, to arbitrate. Guidotti, 716 F.3d at 780.  The Court of Appeals specifically questioned whether Plaintiff's "unsworn claim" that the AADS did not accompany the documents indisputably received by Plaintiff in September 2009 sufficed to "outright" substantiate such assertion, particularly given Plaintiff's near-contemporaneous execution of the SPAA.  Id. at 769, 779-80. The Court of Appeals therefore remanded this action for additional evidentiary development on the validity of the agreement to arbitrate, and clarified Third Circuit law that any renewed motion to compel

4

arbitration be entertained under the summary judgment standard of Rule 56, Fed. R. Civ. P.  Id. at 780.

Following seven months of additional factual discovery [Docket Items 146, 148, & 150], Defendants, armed with a more robust factual record, now renew their motion to compel arbitration.  [Docket Item 155.]

The principal issues presented by the pending motion are whether genuine issues of material fact exist on the parties' agreement, if at all, to arbitrate, and whether the nature of the arbitration clause renders such provision substantively and/or procedurally unconscionable.  For the reasons that follow, the Court will deny Defendants' motion to compel arbitration.[2]

## II.  BACKGROUND

### A. Rule 56.1 Statements

Plaintiff filed two statements of material fact in opposition to Defendants' motion: one identified as Plaintiff's response to Defendants' statement of material facts [Docket Item 157-2], and the other entitled Plaintiff's certified statement of material facts in opposition to Defendants' motion. [Docket Item 157-3.]

---

[2] The Court conducted oral argument on the pending motions on October 6, 2014.

Defendants move to strike Plaintiff's certified statement of material facts on the basis that Plaintiff's statement contravenes Local Civil Rule 56.1(a) by setting forth argumentative and conclusory statements without appropriate citations to record evidence, and by impermissibly relying upon hearsay statements. (Defs.' Br. at 2-3 [Docket Item 164-1].) Defendants also argue that Plaintiff lacks personal knowledge for the vast majority of the assertions set forth in her statement, the accuracy of which Plaintiff certified under penalty of perjury. (Id. at 9-15.)

Local Civil Rule 56.1(a) generally permits the opponent of summary judgment to "furnish a supplemental statement of disputed material facts, in separately numbered paragraphs citing to the affidavits and other documents submitted in connection with the motion," to the extent necessary "to substantiate the factual basis for opposition." L. CIV. R. 56.1(a). Plaintiff's eighty-eight paragraph certified statement of material facts sets forth lengthy factual assertions, many of which lack citations to affidavits or other documents submitted in connection with Plaintiff's submission. [Docket Item 13-3.] Moreover, much of Plaintiff's supplemental statement concerns the legal relevance and weight to be afforded such facts, the inclusion of which the Court finds inappropriate in connection with a Rule 56.1(a) supplemental statement. See L. CIV. R.

6

56.1(a) ("Each statement of material facts shall be a separate
document (not part of a brief) and shall not contain legal
argument or conclusions of law."). Finally, the Court agrees
with Defendants that Plaintiff's certified statement fails to
set forth verbatim recitations or accurate paraphrases of the
deposition testimony of Jennifer Kelly and Brent Hampton.
Rather, Plaintiff's certified statement clearly editorializes
such testimony. (Compare, e.g., Certified Statement of Material
Facts (hereinafter, "CSMF"), ¶ 37, with Kelly Dep. at 34:25-
35:19.) The Court, accordingly, will grant Defendants' motion
to strike, and will disregard Plaintiff's submission to the
extent it states legal arguments or conclusions of law, and to
the extent Plaintiff failed to appropriately support her factual
assertions through record citations, contrary to Local Civil
Rule 56.1(a).

The Court need not, however, entirely disregard Plaintiff's
certified statement to the extent that such statement otherwise
comports with Local Civil Rule 56.1(a) by setting forth, in
part, substantiating citations for Plaintiff's factual
averments. Defendants' motion to strike will, therefore, be
denied to the extent Defendants urge the Court to entirely
disregard Plaintiff's certified statement. Rather, all
statements will be considered to the extent permissible under
Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1.

However, to the extent either party failed to make clear any dispute of material fact in their respective Rule 56.1 statements by citing to contrary evidence in the record, the Court assumes that the opponent has no evidence raising a genuine dispute with respect to the stated fact. The Court will therefore deem any such fact undisputed for purposes of the pending motion. See L. Civ. R. 56.1(a) ("[A]ny material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion."). Having so concluded, the Court turns the facts of this litigation, as derived from the parties' voluminous exhibits and their 56.1 statements.

### B. Factual Background

In September 2009, Plaintiff provided defendants JG Debt Solutions and Eclipse Financial, Inc. (hereinafter, "Eclipse") with certain non-public, personally identifying biographical and financial information, in order to determine Plaintiff's eligibility for a debt resolution program. (Defs.' Statement of Material Facts (hereinafter, "SMF") at ¶ 1; Pl.'s Responsive Statement of Material Facts (hereinafter, "RSMF") at ¶ 1.) In light of Plaintiff's interest in the debt resolution program, Eclipse emailed Plaintiff the relevant program documents, through the DocuSign system, on September 21, 2009.[3] (Kelly

---

[3] For the reasons stated below, the Court rejects Defendants' assertion that Eclipse emailed the program documents directly to

Dec., Attach. 1 ("[Agreement] was emailed to DocuSign."); Kelly Dep. at 21:1-14 (describing the DocuSign process).)  Though Plaintiff has no recollection of receiving such documents by email, or signing such documents through DocuSign (Giudotti Dep. at 62:10-16), the DocuSign "Certificate of Completion" reflects that Plaintiff received on September 21, 2009, and electronically signed on September 22, 2009, ten documents, including Defendants' SPAA.  (Pl.'s App., Pa000022 (DocuSign Envelope ID: 92E83CC3-FEA5-41CD-9AE7-16FBD3A4E289, Pa000012-Pa000021 (reflecting the same DocuSign Envelope ID).)  In the SPAA, DocuSign'd by Plaintiff on September 22, 2009, Plaintiff "*acknowledged*" receipt of the AADS, and further acknowledged that the SPAA fully incorporates "by reference" the binding terms and conditions of the AADS. (Id. at Pa000021 (emphasis in original).)  In accordance with such conditions, the SPAA authorized Defendants "to initiate" monthly "debits" from Plaintiff's checking account in the amount of $348.68 "until further notice."  (Pl.'s App., Pa 000021.)

Following Plaintiff's execution of the program documents, Joel Gavalas, the owner of defendant J.G. Debt Solutions, Inc., contacted Plaintiff on September 24, 2009 to confirm her understanding of the debt settlement program, including her

---

Plaintiff, in addition to sending such documents through DocuSign.

special purpose account with Defendants.  (Kelly Dec., Attach.
2.)  Mr. Gavalas further directed Plaintiff to anticipate a
"Welcome package" from Legal Helpers containing "important"
documents concerning Plaintiff's obligations under the debt
resolution program.  (See id. at 14:1-14.)

On September 29, 2009, Eclipse emailed Plaintiff, through
the DocuSign system, substantively identical, but partially
revised program documents.  (Defs.' SMF at ¶¶ 12-13; Pl.'s RSMF
at ¶ 10; Pl.'s App., Pa000001; Kelly Dec., Attach. 1
("[Agreement] was emailed to Docusign.").)  Though Plaintiff
recalls receiving such documents electronically through DocuSign
on September 30, 2009 (Pl.'s RSMF at ¶¶ 12-13), she "didn't take
the time to review each page or [to] read any other documents."
(Guidotti Dep. at 63:16-20.)  Instead, she "just pointed and
clicked" on those portions of the documents that required an
electronic signature, and promptly "sent them back."  (Id.;
49:1-12; 66:6-7; 68:23-25; 69:14-23.)

The revised program documents, however, included an
identical copy of Defendants' SPAA, in which Plaintiff similarly
"*acknowledged*" receipt of the AADS, and further acknowledged
that the SPAA fully incorporates "by reference" all of the
AADS's terms and conditions. (Pl.'s App., Pa000011 (emphasis in
original).)  In accordance with such conditions, the revised
SPAA authorized Defendants "to initiate" monthly "debits" from

10

Plaintiff's checking account in the revised amount of $353.62
"until further notice." (Pl.'s App., Pa000021.) Despite such
terms, Plaintiff did not review the SPAA's fine print, nor did
she take note of the language incorporating by reference the
AADS. (Defs.' SMF at ¶ 20; Pl.'s RSMF at ¶ 20.)

In light of Plaintiff's execution of the SPAA, Global,
identified by the SPAA as the "service agent" and "processor"
for all activity related to Plaintiff's special purpose account
(id.), mailed Plaintiff a "welcome" letter dated September 29,
2009. (Pl.'s App., Pa000024.) In the letter, receipt of which
Plaintiff acknowledges (Pl.'s RSMF at ¶ 16), Global directed
Plaintiff to "carefully" review the packet "in its entirety"
because "it contain[ed] important information regarding [her]
account." (Pl.'s App., Pa000024 (emphasis in original).)
Global further stated that "detailed information" concerning
Plaintiff's special purpose account could be found in the AADS
appended to the welcome package. (Pl.'s App., Pa000024; Defs.'
SMF, Ex. 5 to Guidotti Dep.) The appended AADS stated that it
"contain[ed] the terms, conditions, and disclosures" that
governed Plaintiff's special purpose account, and specifically
included an Arbitration and Application of Law provision,
providing that

> In the event of a dispute or claim relating in any way
> to [the AADS] or [Global's] services, [Plaintiff]
> agree[s] that such dispute shall be resolved by

> binding arbitration in Tulsa[,] Oklahoma utilizing a
> qualified independent arbitrator of Global's
> choosing. The decision of an arbitrator will be final and
> subject to enforcement in a court of competent
> jurisdiction.

(Pl.'s App., Pa000026-27.)

Shortly thereafter, Legal Helpers Debt Resolution, LLC (hereinafter, "Legal Helpers"), the debt resolution law firm responsible for the negotiations concerning Plaintiff's outstanding debts, mailed its own twenty-nine page "Welcome Packet" to Plaintiff, which included, among an array of program documents, an unexecuted version of Plaintiff's revised SPAA (reflective of upwardly adjusted monthly debit of $353.62) and an additional and identical copy of the incorporated AADS. (Defs.' SMF at ¶ 22; Pl.'s RSMF at ¶ 22; Ex. 6 to Guidotti Dep.) Plaintiff received such documents "around October 19, 2014[,]" but again only "glanced" through the majority of the documents, choosing instead to file the documents, without additional review, "in the folder" containing the remainder of Plaintiff's program "papers." (Guidotti Dep. at 84:18-86:3.)

In accordance with the SPAA and AADS, Global administered two special purpose accounts on Plaintiff's behalf. (Defs.' SMF at ¶ 23; Pl.'s RSMF at ¶ 23; Pl.'s App., Pa000383-395.) The initial transfers into Plaintiff's accounts, however, did not occur until December 30, 2009, at which time Global transferred (in accordance with the SPAA) $120.34 from Plaintiff's personal

bank account into Plaintiff's initial special purpose account
(Defs.' SMF at ¶ 25; Pl.'s RSMF at ¶ 25; Pl.'s App., Pa000383),
an amount similarly transferred into Plaintiff's second special
purpose account on March 22, 2010.[4]  (Defs.' SMF at ¶ 25.)

     "Somewhere around" February 2010, Plaintiff then received a
follow-up "welcome" packet from Global dated February 3, 2010.
(Guidotti Dep. at 97:8-15; Pl.'s App., Pa000057.)  In this
welcome package, Global again advised Plaintiff to pay
"careful[]" attention to the "detailed information" concerning
her special purpose accounts, and directed Plaintiff, in
particular, to review the AADS appended to Global's
correspondence.  (Pl.'s App., Pa000057.)  Upon receipt of
Global's "welcome" letter, Plaintiff "[g]lanced at the front
page and put it in [her program] folder."  (Guidotti Dep. at
97:16-18.)

---

[4] The Court rejects Plaintiff's assertion that the first relevant
transfer under the SPAA occurred on October 2, 2009, at which
time Legal Helpers debited the sum of $461.05 from Plaintiff's
personal bank account.  (See Pl.'s Opp'n at 15; Pl.'s App.,
Pa000437.)  The SPAA, on its face, only concerns Global's
authorization to deduct certain sums from Plaintiff's personal
bank account.  (See, e.g., Pl.'s App., PA000021 (authoring RMBT,
"through its agent Global, to initiate debt entries").)  The
Legal Helpers' retainer agreement, by contrast, authorizes Legal
Helpers to initiate separate deductions from Plaintiff's
personal bank account for "all legal fees and service costs[.]"
(Id. at Pa000042.)  The October 2, 2009 deduction clearly
occurred in accordance with the retainer agreement, not the
SPAA.  (See PA000440 (reflecting an "ACH Debit" by "GCS" in the
amount of $120.34 and a separate "ACH Debit" by "Legal Helper's"
in the amount of $233.28).)

On February 4, 2010, Global commenced regular fund transfers (in the amount of $353.62 per month) from Plaintiff's personal bank account into her special purpose account. (Defs.' SMF at ¶ 27.) Plaintiff's participation in the program continued throughout the remainder of that year, during which time Plaintiff received, by mail, monthly account statements from Global. (Ex. 9 to Guidotti Dep.) In early 2011, however, Plaintiff closed her special purpose accounts with Defendants and Global, accordingly, remitted the balance of her accounts in March 2011. (Pl.'s RSMF at ¶¶ 30-31; Ex. 13 to Guidotti Dep.)

**C. Procedural History**

Defendants removed this action from the Superior Court of New Jersey, Burlington County, on March 3, 2011. [Docket Item 1.] Plaintiff thereafter filed an Amended Complaint in this federal litigation on March 17, 2011. [Docket Item 4.] In her Amended Class Action Complaint, Plaintiff generally alleges that Defendants defrauded Plaintiff, and those similarly situated, by advertising, marketing, and performing "unlawful" debt adjustment and negotiation services, and by "engaging in the unauthorized practice of law in the State of New Jersey." (First Am. Class Compl. [Docket Item 4], 2, 10.)

In lieu of an answer, Defendants filed their initial motion to compel arbitration on May 23, 2011. [Docket Item 27.] In their initial motion, as here, Defendants argued that the

"unequivocal" language of the AADS, including its "valid and enforceable" arbitration provision, required that Plaintiff "be compelled to arbitration." (Defs.' Br. [Docket Item 27-1], 7-8.) Plaintiff, however, asserted in opposition that she never agreed to arbitrate disputes between herself and Defendants, particularly because Plaintiff did not receive the AADS prior to executing the SPAA, and because the SPAA's incorporation of the AADS "did not have a reasonably clear and ascertainable meaning." (Pl.'s Opp'n [Docket Item 48], 27-28.)

In the Court's December 20, 2011 decision denying Defendants' initial motion, the Court found the record sufficient to conclude that Defendants' initial collection of documents did not include the AADS. Guidotti, 866 F. Supp. 2d at 333. The Court therefore determined that the formation of the parties' contractual relationship (through Plaintiff's electronic signature on the SPAA) occurred prior to Plaintiff's receipt of the AADS, including its arbitration clause. Id. at 334. In addition, the Court found, in reliance upon Alpert v. Goldberg, 983 A.2d 604 (N.J. Super. Ct. App. Div. 2009), the AADS "not properly incorporated into the SPAA," because Plaintiff, "the party to be bound," had neither knowledge of the existence of the arbitration clause, nor possession of its specific provisions. Id. at 336. Consequently, because the SPAA failed to properly incorporate the AADS, the Court

15

concluded that such provision could not compel Plaintiff to arbitrate.  Id.

On January 17, 2012, Defendants filed a notice of appeal pursuant to Section 16 of the Federal Arbitration Act (hereinafter, the "FAA") [Docket Item 104], and the Court thereafter granted Defendants' motion to stay the litigation as to them pending disposition of their appeal.  [Docket Items 137 & 138.]  On May 28, 2013, the Court of Appeals found the record "insufficient" to demonstrate the absence of issues of fact concerning whether the parties' agreed to arbitrate.  Guidotti, 716 F.3d at 767, 780.  In so holding, the Court of Appeals acknowledged its "inconsistent pronouncements" concerning the standard governing motions to compel arbitration, and therefore endeavored, through its Opinion, "to clarify the standards to be applied to such motions, and the circumstances" under which district courts should apply the standards for a motion to dismiss, Rule 12(b)(6), Fed. R. Civ. P., as opposed to the standard for summary judgment found in Rule 56, Fed. R. Civ. P. Guidotti, 716 F.3d at 767, 773.

In that regard, the Court of Appeals articulated a spectrum.  Specifically, in "light of both the FAA's insistence that private agreements be honored and the judicial responsibility to interpret the parties' agreement, if any, to arbitrate[,]" the court determined that a motion to compel

16

arbitration should only be considered "'without the inherent delay of discovery'" under a Rule 12(b)(6) standard, where the face of the complaint (or the documents relied upon in the complaint) demonstrates, with sufficient clarity, the parties' agreement to arbitrate. Guidotti, 716 F.3d at 774-75 (citation omitted).  Where, however, arbitrability is not apparent on the face of the complaint, or where the non-movant proffers "enough evidence" to place the validity of arbitration agreement in issue, the Court of Appeals concluded that "a 'restricted inquiry into factual issues' will be necessary to properly evaluate" the presence, if at all, of "a meeting of the minds on the agreement to arbitrate[.]" Id. at 775.

Here, the Court of Appeals found it "significant" that neither party was able to furnish a copy of the AADS reflecting Plaintiff's electronic signature and, accordingly, concluded that Plaintiff proffered "enough evidence" in opposition to Defendants' motion to "trigger the application of the summary judgment standard" to the issue of arbitration.  Id. at 779. The Court of Appeals therefore found a Rule 12(b)(6) inquiry too restrictive in its ability to account for Plaintiff's proffer, because "no reading" of Plaintiff's Complaint, taken solely on its face, "could rightly relieve" Plaintiff of the binding arbitration provision of the AADS. Id. at 778.  Mindful of the controverted evidence, the Court of Appeals concluded that the

Court should have, prior to resolving the initial motion, permitted "limited discovery" and entertained the initial motion under a summary judgment standard and, accordingly, remanded the matter for such consideration.  Id. at 780.

In accordance with the Court of Appeal's mandate, the parties engaged in seven months of limited factual discovery [Docket Items 146, 148, & 150], and the pending, renewed motion to compel arbitration followed.

## III. STANDARD OF REVIEW

Here, the Court must, in accordance with Federal Rule of Civil Procedure 56, delve into "a 'restricted inquiry into factual issues'" in order to determine whether the parties engaged in a meeting of the minds on an agreement to arbitrate. Guidotti, 716 F.3d at 774 (citation omitted).  The Court will, accordingly, only grant Defendants' motion to compel arbitration if the Court finds no genuine factual dispute as to the validity of the agreement.  FED. R. CIV. P. 56(a). In so considering, the Court must view the evidence in the light most favorable to Plaintiff, and must provide Plaintiff with the benefit of all reasonable inferences.  Scott v. Harris, 550 U.S. 372, 378 (2007); Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d Cir. 2014).

18

## IV.  Discussion

### D. Federal Arbitration Act, 9 U.S.C. §§ 1-16

The FAA directs courts to compel arbitration of claims arising out of a valid agreement to arbitrate and reflects "the national policy favoring arbitration agreements." Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 443 (2006).  Indeed, the FAA makes such agreements "'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'"  AT&T Mobility LLC v. Concepcion, 131 S.Ct. 1740, 1744 (quoting 9 U.S.C. § 2).

The preference for arbitration, however, is not without limits.  Rather, because arbitration constitutes "'a matter of contract between the parties,' a judicial mandate to arbitrate must be predicated upon the parties' consent." Guidotti, 716 F.3d at 771 (quoting Par-Knit Mills, Inc., 636 F.2d at 54).

Consequently, in order to compel arbitration, the Court must therefore engage in a two-step inquiry into whether: "(1) a valid agreement to arbitrate exists, and [whether] (2) the particular disputes falls within the scope of that agreement." Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 160 (3d Cir. 2009) (citing Trippe Mfg. Co. v. Niles Audio Corp., 401 F.3d 529, 532 (3d Cir. 2005)).

### E.  State Law Contract Principles

In determining whether the parties entered into a valid agreement to arbitrate, courts "turn to 'ordinary state law principles that govern the formation of contracts.'"  Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 160 (3d Cir. 2009) (quoting First Options of Chic., Inc. v. Kaplan, 514 U.S. 938, 944 (1995)).  Consequently, the Court notes that New Jersey courts have long favored arbitration as a means of resolving disputes and are guided by the national policy and State interest preferring arbitration when interpreting such agreements.[5]  Delta Funding Corp. v. Harris, 912 A.2d 104, 110 (N.J. 2006); Martindale v. Sandvik, Inc., 800 A.2d 872, 877 (N.J. 2002).  "Arbitration's favored status does not mean that every arbitration clause, however phrased, will be enforceable." Atalese v. U.S. Legal Servs. Grp., L.P., 99 A.3d 306, 312 (N.J. 2014).  Rather, an "agreement to arbitrate, like any other contract, 'must be the product of mutual assent," and "requires 'a meeting of the minds.'"  Id. at 312-13 (citations omitted). Mutual assent to arbitrate, in turn, requires that the parties have full knowledge and "understanding of the terms to which

_____

[5] On the record on November 6, 2014, the parties conceded that New Jersey law applies for the purposes of the pending motion to compel arbitration.

they have agreed." Atalese, 99 A.3d at 313. Indeed, the New

Jersey Supreme Court has explained:

> In respect of specific contractual language, "[a]
> clause depriving a citizen of access to the courts
> should clearly state its purpose. The point is to
> assure that the parties know that in electing
> arbitration as the exclusive remedy, they are waiving
> their time-honored right to sue." [Marchak v. Claridge
> Commons, Inc., 633 A.2d 531, 535 (N.J. 1993)]. As we
> have stressed in other contexts, a party's waiver of
> statutory rights "must be clearly and unmistakably
> established, and contractual language alleged to
> constitute a waiver will not be read expansively."
> [Red Bank Reg'l Educ. Ass'n v. Red Bank Reg'l High
> Sch. Bd. Of Educ., 393 A.2d 267, 276 (N.J. 1978)].

Garfinkel v. Moga, 773 A.2d 665, 670 (N.J. 2001).

## F. The AADS Fails to Constitute a Valid Agreement to Arbitrate

Defendants' arguments concerning the validity of the AADS

as a binding agreement to arbitrate are threefold: first,

Defendants argue that Plaintiff received the AADS in connection

with Plaintiff's initial and/or revised SPAA; additionally, and

in the alternative, Defendants assert that the SPAA lawfully

incorporated the AADS; and finally, Defendants argue that

Plaintiff manifested assent to the AADS through her continued

use of her special purpose account.

The Court readily dispenses with Defendants' first and

second arguments, because factual disputes clearly preclude a

finding in Defendants' favor on the question of whether the AADS

accompanied the various initial collections of documents.

21

Notably, though the record well-documents Defendants'
transmission of the SPAA through the DocuSign system, Defendants
have produced no evidence similarly reflecting Plaintiff's near
contemporaneous receipt of such documents by direct email.
Moreover, neither the deposition testimony nor the purportedly
contemporaneous file notes dispel any doubt concerning
Plaintiff's receipt of the AADS by separate email.[6]   The Court

---

[6] The Court therefore rejects Defendants' assertion that New
Jersey law deems the SPAA and the AADS a single contract,
regardless of whether the AADS accompanied the SPPA, or even
whether Plaintiff ever received the AADS. (Defs.' Br. at 27
(citations omitted).)  Though New Jersey law recognizes that
"two or more writings may constitute a single contract even
though they do not refer to each other[,]" whether such writings
are to be construed as a single contract depends solely upon the
parties' intent. Van Orman v. Am. Ins. Co., 680 F.2d 301, 306
(3d Cir. 1982); see also Lawrence v. Tandy & Allen, 100 A.2d
891, 894-95 (N.J. 1953) (same). Defendants have not demonstrated
such intent in this instance.  Nor is the Court persuaded by
Defendants' reliance upon N.J. MetroMall Urban Renewal Inc. v.
City of Elizabeth, 26 N.J. Tax 276 (N.J. Tax 2003), Carfagno v.
Ace, Ltd., No. 04-6183, 2005 WL 1523530 (D.N.J. June 28, 2005),
and Days Inn Worldwide, Inc. v. Prudent Lodging of Kalamazoo,
LLC, No. 11-2493, 2011 WL 3329526 (D.N.J. Aug 1, 2011).  In all
three cases, the courts generally found the defendants' failures
to provide the precise arbitration provisions in connection with
the initial agreements insignificant to the issue of enforcing
such provisions, given the initial agreements' "clear and
unambiguous" reference to "final and binding" arbitration.
Carfago, 2005 WL 1523530, *10 (finding "no merit to the
argument" that an arbitration clause "should be held invalid
because the arbitration policy was not made available to each of
the four [plaintiffs] before signing" their employment
agreement, given the employment agreement's "clear and
unambiguous language" that any dispute "would be resolved
'EXCLUSIVELY' through final and binding arbitration"); Days Inn,
2011 WL 3329526, at *2 (finding plaintiff's allegation that he
"'never saw'" the license agreement insufficient to excuse
performance, given the guaranty agreement's "explicit reference

similarly rejects, principally for the unaltered reasons stated

in the Court's December 20, 2011 Opinion, Defendants'

alternative argument concerning the sufficiency of the SPAA's

incorporation of the AADS.  Rather, genuine issues of fact

clearly persist concerning whether Plaintiff had the AADS at the

time she signed the SPAA, and it is axiomatic that an agreement

cannot be found properly incorporated, if the provisions of such

agreement are not known by the party to be bound at the time of

acknowledgment.[7]  <u>Alpert, Goldberg, Butler, Norton & Weiss, P.C.</u>

---

to specific sections of the" license agreement); <u>N.J. Metromall</u>,
22 N.J. Tax at 286 (reading multiple contracts in unison, in
light of a clear "understanding by the parties" in support of
such construction).  The SPAA, by contrast, contains no
similarly clear and unambiguous reference.  (<u>See, e.g.</u>, Pl.'s
App., Pa000011.)  Nor is there any support for counsel for
Defendants' assertion that the SPAA constituted an application,
rather than an agreement.  Indeed, the SPAA, by its very terms,
indicates that it serves as the Agreement between the parties,
and Plaintiff executed no other documents in connection with the
serviced rendered by Defendants.  (<u>See, e.g.</u>, Pl.'s App.,
Pa000021 (noting that Plaintiff applied for "and agree[d] to
establish a special purpose account" with Defendants, and
further acknowledged that such "Application is subject to
[Defendants'] customer identification program, as required [by]
the USA Patriot Act and other applicable laws").)
[7] Nor does the Court agree with Defendants' reliance upon <u>Willis</u>
<u>v. Debt Care USA, Inc.</u>, No. 11-430, 2012 WL 5844695 (D. Or. Nov.
19, 2012).  In <u>Willis</u>, under facts similar to this litigation,
the district court considered whether a substantively identical
SPAA properly incorporated the AADS's arbitration provision.
<u>Id.</u> at *4.  In finding proper incorporation, the district court
stated, citing Oregon law, that it could locate no authority
that prohibited incorporation of another writing solely because
"the other writing [was] not simultaneously delivered[.]"  <u>Id.</u>
Such finding, however, occurred after a "'summary [bench]
trial'" on the issue of whether the parties agreed to arbitrate,
not in the context of a summary judgment motion.  <u>Id.</u> at *1.

v. Quinn, 983 A.2d 604, 617 (N.J. Super. Ct. App. Div. 2009);[8]
see also Nova Corp. v. Joseph Stadelmann Elec. Contractors,
Inc., No. 07-1104, 2008 WL 746672, at *3 (D.N.J. Mar. 18, 2008)
("'Incorporation by reference is proper where the underlying
contract makes clear reference to a separate document, the
identity of the separate document may be ascertained, and
incorporation of the document will not result in surprise or
hardship.'") (citations omitted).  Affording Plaintiff the
benefit of all reasonable inferences, and given the demonstrable
absence of clear evidence, the Court finds these arguments
without merit.

Moreover, even if the Court assumed that Plaintiff received
the AADS and/or that the SPAA sufficiently incorporated the
AADS, the Court concludes that the arbitration provision of the
AADS fails, on its face, for two reasons.  First, the Court
finds the provision's failure to contain a clear expression of a

---

Moreover, the law in New Jersey, as illustrated by Alpert,
clearly differs in material respects and, in any event, an
unpublished decision from another district (applying another
state's law) does not constitute binding authority on this
Court.
[8] In addition to recapitulating their arguments concerning the
purportedly distinguishable features of Alpert, Defendants argue
that the standard applicable to the pending motion, as opposed
to the standard applied to the initial motion, dictates a
contrary conclusion.  (Defs.' Br. at 28 n.115.) The Court's
legal interpretation of Alpert remains unaltered regardless of
the standard of review applicable to the pending motion, and no
amount of discovery could affect the Court's construction of
Alpert's crystalline language concerning New Jersey's law of
incorporation by reference.  See Alpert, 983 A.2d at 617-18.

waiver of rights nullifies any mutual assent that Plaintiff may otherwise have manifested.  Second, the Court finds the terms of such provision substantively unconscionable and, therefore, unenforceable.  For these reasons, the Court also rejects Defendants' third argument.

### 1. The AADS Lacks the Clarity Required under New Jersey State Law

Defendants argue that Plaintiff's continued use of her special purpose account upon receipt of the AADS amply reflected Plaintiff's assent to the AADS's provisions.  (See Defs.' Reply at 11-14.)  Plaintiff counters, however, that the arbitrative provision fails to contain clear and unambiguous language concerning Plaintiff's waiver of her right to sue.  (See Pl.'s Ltr. Br. at 2.)  In that regard, the Court finds Atalese v. U.S. Legal Services Group, L.P., 99 A.3d 306, 312 (N.J. 2014) instructive.

In Atalese, plaintiff, an individual consumer, contracted with defendant for debt-adjustment services.  Id. at 309.  The parties' agreement contained an arbitration provision for the resolution of any dispute arising out of the agreement, but, as here, nowhere indicated that such provision waived plaintiff's statutory right to seek court relief.  Id.  In her civil complaint, plaintiff alleged that defendant violated New Jersey's Consumer Fraud, N.J.S.A. §§ 56:8-1 to -20, and Truth-

in-Consumer Contract, Warranty and Notice, N.J.S.A. §§ 56:12-14
to -18, Acts, by promising to negotiate with all of plaintiff's
creditors, but settling instead "only a single debt" in exchange
for an approximately $5,000 fee.  Id.  Defendant, relying upon
the arbitration provision in the parties' service contract,
moved to compel arbitration.  Id. at 310.  The Superior Court of
New Jersey found the provision "'minimally'" sufficient to put
plaintiff on notice of the arbitration requirement, and
compelled arbitration.  The New Jersey Appellate Division
affirmed, finding the arbitration clause provided the "'parties
reasonable notice of the requirement to arbitrate all claims
under the contract," and that "a reasonable person, by signing
the agreement, [would have understood] that arbitration is the
sole means of resolving contractual disputes.'"  Id. at 311.

The New Jersey Supreme Court, however, reversed, finding
the language of the service agreement insufficient to "clearly
and unambiguously signal to plaintiff" that, by executing the
arbitration provision, she surrendered "her right to pursue her
statutory claims in court."  Id. at 316.  Indeed, the clause
merely stated that either party may submit any dispute to
"'binding arbitration,'" but provided no explanation concerning
arbitration, nor language, sufficiently plain, to advise
plaintiff that such provision relinquished her right to sue or
otherwise secure court relief.  Id. at 315.

26

Rather, the Atalese court stated that an enforceable waiver-of-rights clause requires a clear and unmistakable expression that the provision waives the individual's time-honored right to sue.  Id. at 314.  In so holding, the Court noted that "[n]o particular form of words" accomplish the requisite "clear and unambiguous" waiver of rights, but concluded that arbitration clauses—and other contractual clauses—pass muster only when phrased in language understandable to the reasonable consumer.   Id.

In addition, the Atalese court recognized the FAA's prohibition against a state subjecting an "'arbitration agreement to more burdensome requirements than'" other contractual provisions, but stressed that a clarity requirement in contractual language fails to constitute a requirement "specific to arbitration provisions."  Id. at 312-13.  Rather, the court noted that New Jersey contract law requires, overall, that any waiver-of-rights provisions "'be clearly and unmistakably established.'"  Id. at 313-15 (quoting Garfinkel, 773 A.2d at 670).  The court therefore emphasized that its decision imposed "no greater burden on an arbitration agreement than any other agreement waiving constitutional or statutory rights."  Id. at 316.

Application of the sensible and binding contract principles enunciated in Atalese compel a clear conclusion in this instance: the arbitration provision of the AADS fails. Indeed, as in Atalese, the arbitration provision requires Plaintiff to submit to binding arbitration, but provides no clear and unequivocal indication that such provision waives Plaintiff's right to seek relief in Court. (See, e.g., (Pl.'s App., Pa000026-27.) Indeed, the provision nowhere references that it effectuates a waiver of Plaintiff's right to sue. (Id.) Moreover, the clause provides no explanation concerning the nature of an arbitration proceeding, nor an indication concerning how arbitration differs from a traditional court proceeding. (Id.) Rather, in fine print on the second page of a substantively dense document, the arbitration provision obligates, without explanation, resolution by arbitration of all disputes. (Id.) Such provision, however, plainly fails to advise Plaintiff of its effect, namely, that it bars her from seeking court relief. Such failure nullifies any mutual assent that may have otherwise been manifested by Plaintiff with respect to the AADS. See Atalese, 99 A.3d at 316 ("Mutual assent to an agreement requires mutual understanding of its terms.") Indeed, "'[a]n effective waiver requires a [consumer] to have full knowledge of [her] legal rights'" before she relinquishes them, and Plaintiff could not, given the language

28

of the provision, have had such knowledge in this instance.  Id. (citation omitted).

In so concluding, the Court rejects Defendants' assertion that the FAA preempts the application of the Atalese rule.  (See Defs.' Ltr. Br. [Docket Item 171].)  In AT&T Mobility LLC v. Concepcion, 131 S.Ct 1740 (2011), the Supreme Court noted that Section 2 of the FAA "permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses.'"  Id. at 1746 (citation omitted).  The FAA, accordingly, permits states to regulate arbitration agreements in accordance with general contract principles, and to invalidate such provisions "upon such grounds as exist at law or in equity for the revocation of any contract.'" 9 U.S.C. § 2.  The FAA, however, preempts state-based defenses that apply only to arbitration, "that derive their meaning from the fact" that they arise in connection with an agreement to arbitration, and/or that, in practice, disproportionately impact arbitration agreements. Concepcion, 131 S.Ct. at 1746-47.

The Atalese rule, by contrast, results in no such effect. Indeed, the Atalese court specifically noted that New Jersey contract law "repeatedly" recognizes that a waiver of rights, in whatever contractual context, requires a clear and unmistakable expression.  Atalese, 99 A.3d at 314.  In so holding, the New Jersey Supreme Court relied upon an array of jurisprudence in

contexts unconnected with arbitration, in order to demonstrate that then-existing New Jersey Law required that an effective waiver of rights, in whatever context, be plainly expressed.[9] See, e.g., id. at 313-14. Moreover, application of the Atalese rule does not uniquely disfavor or disproportionately impact arbitration. Rather, it requires that a consumer contract's provision waiving rights, including an agreement to arbitrate, be stated in sufficiently clear terms and, if so stated, permits courts to compel arbitration. The Court therefore finds Atalese consistent with the FAA, as construed by the Supreme Court in Concepcion, and, accordingly, follows its rationale in this instance.

Moreover, even if the Court found Atalese preempted by the FAA, the Court would still find, as stated below, the arbitration provision of the AADS substantively unconscionable. See Concepcion, 131 S.Ct. at 1746 (noting that Section 2 of the FAA "permits agreements to arbitrate to be invalidated by

---

[9] The Court therefore finds Defendants' reliance upon Mortensen v. Bresnan Communications, LLC, 722 F.3d 1151 (9th Cir. 2013), unpersuasive. In Mortensen, the Ninth Circuit found Montana's "reasonable expectations/fundamental rights rule" preempted by the FAA, because such rule specifically "arose from state court consideration of adhesive arbitration agreements," and because the rule applied, in primary part, only to such agreements. Id. at 1161. In articulating the Atalese rule, by contrast, the New Jersey Supreme Court relied upon existing New Jersey law that arose in contexts separate and distinct from arbitration. Atalese, 99 A.3d at 313-14 (citing cases, among others, in the labor-relations, licensing, and Condominium Act contexts)

"'generally applicable contract defenses, such as fraud, duress, or <u>unconscionability</u>'") (emphasis added).

### 2. The Arbitration Provision is Substantively Unconscionable to the Extent it Enables Defendants to Exercise Complete Control over the Arbitration Process

Defendants' submissions give short shrift to the issue of unconscionability.  (Defs.' Br. at 32-34; Defs.' Reply at 15.) Rather, Defendants primarily argue, in reliance upon <u>Spinetti v. Serv. Corp. Int'l</u>, 324 F.3d 212 (3d Cir. 2003), that the Court should "simply sever" any unconscionable terms, while enforcing "the remainder of the arbitration agreement."  (Defs.' Br. at 34.)  Plaintiff, by contrast, argues, in reliance upon <u>Newton v. Am. Debt Servs.</u>, 549 F. App'x 692 (9th Cir. 2013), that the arbitration provision must fail as unconscionable.[10]  (Pls.' Opp'n at 23-31.)

For the most part, unconscionability under New Jersey law looks for "'two factors: (1) unfairness in the formation of the

---

[10] Plaintiff's arguments concerning unconscionability pertain, in primary part, to the specific arbitration provision of the AADS. (<u>See generally</u> Defs.' Br. at 23-31.)  Because substantive federal arbitration law views arbitration provisions as "severable from the remainder of the contract[,]" <u>Buckeye Check Cashing, Inc.</u>, 546 U.S. at 445-46, the Court need not address any other elements of the AADS, because the Court's disposition of the pending motion renders unnecessary any inquiry into the AADS's "Limitation of Liability" and "Attorneys Fees and Costs" provisions.  The Court notes, however, that <u>Newton</u> found such provisions substantively unconscionable.  594 F. App'x at 694.

contract, and (2) excessively disproportionate terms.'"[11]

Travelodge Hotels, Inc. v. Honeysuckle Enters., Inc., 357 F. Supp. 2d 788, 801 (D.N.J. 2005) (quoting Sitogum Holdings, Inc. v. Ropes, 800 A.2d 915, 921 (N.J. Super. Ct. Ch. Div. 2002) (citations omitted)).  The first factor—procedural unconscionability—considers defects in the formation, namely, the parties' "age, literacy, lack of sophistication," and the presence of "hidden or unduly complex contract terms, bargaining tactics, and the particular setting existing during the contract formation process."  Id.  The second factor—substantive unconscionability—simply suggests "the exchange of obligations so one-sided as to shock the court's conscience."  Sitogum Holdings, Inc., 800 A.2d at 921.  In the event an analysis of such factors dictates unconscionability, courts have broad discretion to fashion an appropriate remedy.  See Pyo v. Wicked Fashions, Inc., No. 09-2422, 2010 WL 1380982, at *4 (D.N.J. Mar. 31, 2010).  The court may, for example, deem the agreement unenforceable in its entirety, may strike the unconscionable

_____

[11] In somewhat parallel fashion, New Jersey law directs a court, in determining whether to enforce the terms of a contract of adhesion, to look "'not only to the take-it-or-leave-it nature or the standardized form of the document but also to the subject matter of the contract, the parties' relative bargaining positions, the degree of economic compulsion motivating the 'adhering' party, and the public interests affected by the contract.'"  Muhammad v. Cnty. Bank of Rehoboth Beach, Del., 912 A.2d 88, 97 (N.J. 2006) (quoting Rudbart v. North Jersey Dist. Water Supply Comm'n, 605 A.2d 681, 687 (N.J. 1992)).

provision and enforce the remainder of the agreement, or may
limit the application of the unconscionable provision in order
to avoid an unconscionable result. See id. (citing N.J.S.A. §
12A:2-302).  Moreover, the Court may under Section 5 of the FAA,
"designate and appoint an arbitrator" under certain conditions.
9 U.S.C. § 5

    In arguing that the arbitration provision of the AADS fails
as procedurally unconscionable, Plaintiff asserts that her
unequal "bargaining position" resulted in a provision of
adhesion.  (Pl.'s Opp'n at 28-29.)  The Court finds these
arguments unpersuasive.  While a disparity in bargaining power
clearly exists between the parties (one being a sophisticated
nationwide business and the other a private individual
consumer), such disparity will not alone render a contract
unconscionable. See Gilmer v. Interstate/Johnson Lane Corp., 500
U.S. 20, 33 (1991) (finding "[m]ere inequality in bargaining
power" insufficient, without more, to find arbitration
agreements unenforceable).  New Jersey courts similarly conclude
that a contract need not be found unenforceable solely because
of its purportedly adhesive nature.  Gras, 786 A.2d at 889
(noting that, "the mere fact that a contract is adhesive does
not render it unenforceable").  Moreover, Plaintiff has not
shown economic compulsion in the formation of the contract.

33

Rather, the record reflects that Plaintiff contracted with Defendants on her volition.  (See Pl.'s RSMF at ¶¶ 1-4.)

Nor did Defendants leave Plaintiff without option in agreeing to be bound by the arbitration provision of the AADS. To the contrary, Defendants (ultimately) afforded Plaintiff the opportunity to review the plain language of such provision, and specifically enabled Plaintiff to terminate the agreement, without penalty, "at any time" by providing the required written notice.  (Pl.'s App., PA000026.)  Given the strong presumption of the enforceability of arbitration agreements, and the absence of unfair circumstances, the Court does not find the arbitration provision of the AADS procedurally unconscionable.  See Ohai v. Verizon Commc'ns., Inc., No. 05-729, 2005 WL 6563176, at *5 (D.N.J. Oct. 28, 2005) (finding an arbitration clause not procedurally unconscionable, despite its adhesive nature, and the parties' "unequal bargaining power").

In arguing substantive unconscionability, Plaintiff argues that the Court should follow the rationales set forth in Newton v. Am. Debt Servs., 549 F. App'x 692 (9th Cir. 2013) and Davis v. Global Client Solutions, LLC, 765 F. Supp. 2d 937 (W.D. Ky. 2011), both of which found the AADS's arbitration provision substantively unconscionable.  (Defs.' Br. at 29.)  The Court agrees.

34

In <u>Newton</u>, a case involving the same Defendants, the Ninth Circuit found the AADS's arbitration clause substantively unconscionable on four bases, two of which directly relate to this litigation.  594 F. App'x at 694.  The <u>Newton</u> court specifically found that, "the arbitration forum provision require[d] [plaintiff], who reside[d] in [another state], to arbitrate in Tulsa, Oklahoma—Global Client Solutions'[] headquarters" and "reserve[d] the selection of an arbitrator solely to Defendants."  <u>Id.</u> (internal citations omitted).  In <u>Davis</u>, another case involving the same Defendants, the district court found the AADS's arbitration provision substantively unconscionable because it served as a "substantive waiver" of plaintiffs' rights to pursue all available remedies, and because it provided Defendants the sole right to select an appropriate arbitrator.  765 F. Supp. 2d at 942.

The disputed arbitration provision in this instance contains aspects identical to those found unconscionable in <u>Newton</u> and <u>Davis</u>.  The arbitration provision specifically provides that

> In the event of a dispute or claim relating in any way to this Agreement or our services, you agree that such dispute shall be resolved by binding arbitration in <u>Tulsa[,] Oklahoma</u> utilizing a qualified independent arbitrator <u>of Global's choosing</u>. The decision of an arbitrator will be final and subject to enforcement in a court of competent jurisdiction.

(Pl.'s App., Pa000027 (emphasis added).)  Here, as in Newton and
Davis, the Court finds that the arbitration provision fails for
two reasons.  First, the arbitration clause requires that
Plaintiff arbitrate her claims in Tulsa, Oklahoma, the home of
Defendants' headquarters, thereby providing Defendants an unfair
advantage at Plaintiff's expense.  See Newton v. Am. Debt
Servs., Inc., 854 F. Supp. 2d 712, 726 (N.D. Cal. 2012), aff'd,
549 F. App'x 692.  Second, the arbitration clause gives
Defendants the unilateral right to select the "qualified
independent arbitrator[.]" (Pl.'s App., Pa000027.)  Even if the
first infirmity, the inconvenience of the designated forum for
arbitration, fails, by itself, to render the arbitration clause
substantively unconscionable, see Thomas v. Jenny Craig, Inc.,
No. 10-2287, 2010 WL 3076861 (D.N.J. Aug. 4, 2010), when coupled
with the second infirmity, the ability to solely select the
purportedly independent arbitrator, the arbitration provision
enables Defendants to exercise complete control over the
arbitration process.  For that reason, the Court finds the
arbitration provision so one-sided as to be substantively
unconscionable.

     Moreover, the Court does not find Defendants' willingness
to disclaim unconscionable provisions in the wake of this
lawsuit sufficient to render an otherwise unconscionable
provision conscionable.  Rather, as in Newton, the Court finds

any such offer suggestive of Defendants' intent "to maintain a systematic effort to impose unconscionable arbitration provisions."  854 F. Supp. 2d at 727.  The Court therefore follows Newton and Davis, and likewise finds Defendants' arbitration provision substantively unconscionable and, therefore, unenforceable.[12]

_____

[12] Given the pervasive nature of arbitration provision's unconscionable elements (two of the three sentences), the Court cannot, reasonably, sever only those offending portions, for doing so would leave only "a mere agreement to arbitrate," and would entail an extensive reformation of the arbitration agreement. Newton, 549 F. App'x at 695 (affirming the district court's choice not to sever unconscionable portions of an arbitration agreement); see also Hall v. Treasure Bay Virgin Islands Corp., 371 F. App'x 311, 314 (3d Cir. 2010) (finding severance inappropriate where "unconscionable provisions 'permeate the agreement'" and affirming the district court's decision finding the entire arbitration agreement unenforceable).  Moreover, Section 5 of the FAA does not revive an otherwise unconscionable arbitration provision.  Rather, it envisions the designation of an appropriate arbitrator only in the event that an otherwise enforceable arbitration provision fails to so designate.  See 9 U.S.C. § 5; Coup v. Scottsdale Plaza Resort LLC, 823 F. Supp. 2d 931, 953 (D. Ariz. 2011) (rejecting defendants' argument that the court's ability to appoint an arbitrator under Section 5 sufficed, by itself, to overcome plaintiffs' arguments concerning substantive unconscionability).  Here, even if the Court appointed such an arbitrator, the parties would still be left with an empty agreement to arbitrate devoid of additional terms, and the FAA does not empower the Court to fill the significant void left by the unconscionable terms.

**V.    CONCLUSION**

For all of these reasons, Defendants' renewed motion to compel arbitration will be denied.  An accompanying Order will be entered.

_**December 3, 2014**_                              _**s/ Jerome B. Simandle**_
Date                                       JEROME B. SIMANDLE
                                           Chief U.S. District Judge